598 A.2d 1300

**COMMONWEALTH of Pennsylvania**

v.

**Charles REMENTER, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 14, 1991.

Filed Oct. 28, 1991.

12

Samuel C. Stretton, Westchester, for appellant.

Eric Schoenberg, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before ROWLEY, President Judge, and BECK and HESTER, JJ.

BECK, Judge:

On April 19, 1989, the decedent Mary Berry was crushed to death beneath the wheels of a passer-by's automobile while attempting to escape from an ongoing assault by her boyfriend, appellant Charles Rementer. Appellant was charged with having caused the death of Mary Berry and was convicted of murder in the third degree at a non-jury trial. He appeals from the judgment of sentence which was imposed after the denial of post-verdict motions. He raises two primary challenges to his conviction. Appellant first argues that the evidence at trial was insufficient to prove that his conduct caused the death of the victim.[1] He also alleges that the Commonwealth failed to prove malice, an essential element of third degree murder. We affirm.

Appellant's conviction for third degree murder arose from events which occurred during the early evening hours of April 19, 1989 in Philadelphia. On that evening, at about 6:30 p.m., the decedent Berry and appellant entered a bar together at 7th and Oregon. The bartender serving them, who had known Berry for many years, noted that Berry and appellant were arguing, although the bartender could not discern the substance of the argument. During the argument Berry became "very upset" and was "crying hysteri-cal[ly]."

---

1. Appellant also states, in conclusory fashion, that the verdict was against the weight of the evidence. This argument is based entirely upon appellant's contention that the evidence on causation was insufficient as a matter of law. Appellant makes no separate weight of the evidence claim. Since we address and dispose of appellant's argument regarding the sufficiency of the causal connection, we do not separately address the dependent argument on the weight of the evidence.

Shortly thereafter, Berry left the bar and got into her cab, which was parked outside and which she drove for a living. A moment later, appellant followed her, got into the driver's side where Berry was sitting, shoved her into the passenger's seat and drove away.

An out-of-town trucker, Brent Murphy, was taking a break from loading his truck a few blocks from the bar when he saw Berry's cab. Berry was hanging out of the passenger window, screaming "Help me, he's trying to kill me." The driver of the cab, identified as appellant, was holding on to Berry, beating her and pulling her hair. Berry, by "fighting and kicking", had managed to get one leg out of the passenger window, but all the while appellant was "trying to pull her back in by her hair."

While Murphy watched, Berry struggled away from appellant and fell out of the passenger window. Appellant also left the car and continued the assault on Berry, beating her "with his fists in the face" while she was lying on the ground. Murphy ran into a nearby supermarket and told somebody to call the police. When he emerged from the store, appellant was holding Berry against the cab while he continued to beat her. Murphy heard Berry say, "Don't hurt me, Charlie." Appellant pulled Berry into the cab, held her down, shut the door and drove away. About ten minutes later, a short distance away, Murphy saw the police. Berry was dead and the police had been summoned. Murphy explained to the police what he had witnessed moments earlier.

Meanwhile, three young men were standing at a nearby intersection. One of them, David Brotnitsky, saw appellant and Berry standing and arguing under the bridge of the I-95 on-ramp. Berry's cab was parked nearby on Water Street. Appellant punched Berry in the face and Berry ran away from him. Appellant pursued her, grabbed her and dragged her back to the cab. At first, appellant threw Berry in the back seat but she again managed to escape. Appellant then "got out after her and threw her in the front seat." Thinking that the fight was over, Brotnitsky

stopped paying attention. The next thing he noticed was that the police had arrived on Water Street to investigate Berry's death.

Another witness, John Smith, was driving towards Water Street when he saw Berry's cab moving slowing along the curb with the passenger door open. Smith yelled and asked the occupants what was going on. Just then, Berry ran from the cab towards Smith's car shouting unintelligible pleas for help. Another occupant of Smith's car suggested finding a police officer. As he pulled away Smith saw Berry in the rear view mirror. She was lying on the street and a station wagon was driving away "from her body."

Joseph Campbell was also in the vicinity when he saw "Charlie", whom he recognized from the neighborhood, and Berry fighting and arguing. Berry was shouting for help and running from appellant. Campbell saw appellant punch Berry in the head. Berry then ran towards oncoming cars, finally stopping at a station wagon. From where he was standing a short distance away, Campbell saw Berry grab on to the window of the station wagon and then fall. No more than two minutes passed from the time Campbell saw appellant strike Berry in the face to the time she fell beneath the wheels of the station wagon to her death.

The station wagon referred to by Smith and Campbell was driven by Vito Michielli. Michielli and his wife and two small children were on Water Street that evening driving home from a shopping trip. Berry and appellant approached his car forcing him to stop. Berry was screaming "help me" and "let me in" and attempted to open the back door of the station wagon. Michielli and his wife were frightened and the children began to cry. The Michiellis' reaction was to lock all the doors and attempt to close the windows of the car. Mr. Michielli reached out of his window, pushed Berry away and sped off. Not until several days later, when a local newspaper reported the incident and Berry's tragic death, did Michielli realize that in leaving the scene his car had run over Berry.

Michielli's wife also testified. She said that she first saw Berry running up the middle of the street toward their car. Mrs. Michielli stated that appellant was chasing her and that when they reached the Michiellis' car, he was "right behind her". Berry went over to the driver's side of the station wagon and appellant went to the passenger side. Mrs. Michielli saw Berry reach in to open the rear door of the car and heard her scream, "Help me, Help me, please let me in." Mr. Michielli pushed Berry away from the car and immediately drove off. Mrs. Michielli was also unaware at the time that the incident had ended with Berry's death.

The medical examiner's report revealed that Berry had suffered "blunt head trauma consistent with direct blows to the face, recent contusions to the chin, right and left cheeks near the nose and contused lacerations to the upper and lower lips, on the inside of the mouth." The medical examiner also found that Berry sustained a crush injury of the chest, "consistent with a motor vehicle passing over the body." There were also fractures of the skull and of the ribs. The coroner's report, as stipulated to by the parties at trial, concluded that the crush injury was the cause of death. Finally, the Mobile Crime Unit discovered a large clump of Berry's hair inside the cab, which had been forcibly pulled from Berry's head.

At trial, appellant testified on his own behalf. He stated that both he and Berry had injected cocaine earlier on the day of her death. He testified that they were arguing and that they had also been drinking. Appellant stated that he drove Berry's cab out of concern for her welfare because she was "acting schizy from the cocaine." According to appellant, Berry's pleas for help were entirely unprovoked by him. He said that he pulled her back into the cab to prevent her from hurting herself and from "making a scene." Appellant admitted striking Berry but claimed that he did so out of anger because his attempts to calm her down by talking rationally had failed. He also claimed that he hit her only once, did not mean to hurt her and did not intend to kill her.

The trial court found appellant guilty of murder in the third degree. Following the denial of post-trial motions, appellant was sentenced to a term of imprisonment of four to twelve years. On appeal he argues that the Commonwealth failed to present sufficient evidence to establish two essential elements of third degree murder, i.e., causation and malice. We will address each challenge separately.

We begin by noting that here, as with all challenges to the sufficiency of the evidence, the applicable standard of review is well-settled and quite narrow. We must determine whether, viewing all the evidence at trial, as well as the reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence can be considered equally when assessing the sufficiency of the evidence. *Commonwealth v. Hughes*, 521 Pa. 423, 430, 555 A.2d 1264, 1267 (1989); *Commonwealth v. French*, 396 Pa.Super. 436, 578 A.2d 1292 (1990).

Moreover, it is undisputed that causation constitutes an essential element of the offense of murder which the Commonwealth must prove beyond a reasonable doubt.[2] *Commonwealth v. Webb*, 449 Pa. 490, 296 A.2d 734 (1972). Our court has held that: "The Commonwealth must prove a *direct* causal relationship between the defendant's acts and the victim's death." *Commonwealth v. Barnhart*, 345 Pa.Super. 10, 28, 497 A.2d 616, 626, *appeal denied*, 517 Pa. 620, 538 A.2d 874, *cert. denied, Barnhart v. Pennsylvania*, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 34 (1985) (emphasis in original).

The issue regarding causation plainly arises in the instant case because the immediate cause of Berry's death was the

2. Criminal homicide, which encompasses all degrees of murder and voluntary and involuntary manslaughter, is defined as follows: (a) Offense defined.—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being. 18 Pa.C.S.A. § 2501(a) (Purdon 1983).

crushing blow received under the wheels of Michielli's station wagon. Appellant argues that by the time Berry ran over to Michielli's car the "unfortunate domestic dispute" had ended and that therefore Berry's death had an accidental and intervening cause. Thus, according to appellant, the chain of causation between his assault on Berry and her resulting death had been broken. As such, he argues, his actions did not constitute a sufficiently direct cause of Berry's death. Moreover, appellant argues that Berry's death was not foreseeable and stemmed not from his assault but from independent actions by Berry for which he, appellant, cannot be held culpable. We reject these claims.

██ Certain fundamental principles guide our inquiry. First, it is well established that the tort theory of causation will not suffice to impose criminal responsibility. This principle was first explicitly adopted by the supreme court in *Commonwealth v. Root*, 403 Pa. 571, 575, 170 A.2d 310, 311 (1961), which held that "... the accused is not guilty unless his conduct was a cause of death sufficiently direct as to meet the requirements of the *criminal*, and not the *tort*, law." (emphasis in original). The *Root* court explained: "Legal theory which makes guilt or innocence of criminal homicide depend upon such accidental and fortuitous circumstances as are now embraced by modern tort law's encompassing concept of proximate cause is too harsh to be just." *Root*, 403 Pa. at 576, 170 A.2d at 312. Thus, a "more direct causal connection is required for conviction." 403 Pa. at 580, 170 A.2d at 314.

██ It is difficult to draw a bright line between causation in the criminal law and in the tort law. Certain principles can, however, be ascertained. In order to impose criminal liability, causation must be direct and substantial. Defendants should not be exposed to a loss of liberty based on the tort standard which only provides that the event giving rise to the injury is a substantial factor. Although typically the tort context refers only to substantial and not to direct and substantial as in the criminal context, the additional language in the criminal law does not provide

much guidance. Therefore, criminal causation has come to involve a case-by-case social determination; i.e., is it just or fair under the facts of the case to expose the defendant to criminal sanctions. In other words, was the defendant's conduct so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability or was the actual result so remote and attenuated that it would be unfair to hold the defendant responsible for it?

Many cases have grappled with the concept of what constitutes a legally sufficient causal connection where, as here, the immediate cause of death was not the blow dealt by the defendant's hand. We have concluded, from a careful reading of these cases and from analysis provided by criminal law commentators, that the resolution of the causation issue here and in analogous cases involves a two part inquiry. The first part of the inquiry requires us to decide whether the defendant's conduct was an operative cause of the victim's death. With respect to establishing a causal relationship between conduct and result, our crimes code poses a threshold factual requirement and that is, the conduct must be "an antecedent but for which the result in question would not have occurred." 18 Pa. C.S.A. § 303(a)(1) (Purdon 1983). Thus, if the victim's death is attributable *entirely* to other factors and not at all brought about by the defendant's conduct, no causal connection exists and no criminal liability for the result can attach.[3] The second part of the test raises the question of whether the result of defendant's actions were so extraordinarily

---

**3.** *Illustrating this basic concept, one commentator explains:*
"Thus if A shoots at B intending to kill but misses, but at that moment B drops dead of some cause wholly unconnected with the shooting, A is not liable for the murder of B, in spite of the simultaneous existence of the two required ingredients, A's intentional conduct and the fatal result. What is missing is the necessary causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place."
LaFave and Scott, Substantive Criminal Law, Vol. 1, Ch. 3., at 391–392 (1986).

remote or attenuated that it would be unfair to hold the defendant criminally responsible.

In discussing the first part of the test we point out that the defendant's conduct need not be the sole cause of the victim's death in order to establish causal connection. In *Commonwealth v. Skufca*, 457 Pa. 124, 321 A.2d 889, *appeal dismissed*, 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974), a parent left two small children trapped inside a locked apartment while she went out for the evening. A fire started which suffocated the children who were impossible to rescue due to their mother's action in locking them inside an unattended apartment. Suffocation through smoke inhalation was the immediate medical cause of death. In upholding the involuntary manslaughter conviction of the parent, the supreme court emphasized:

> [I]t has never been the law of this Commonwealth that criminal responsibility must be confined to a sole or immediate cause of death.... Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result.

*Commonwealth v. Skufca*, 457 Pa. at 132–133, 321 A.2d at 894. *See also Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979) (defendant's failure to protect her five-year-old child from beatings and abuse inflicted by her boyfriend over a period of at least several weeks was direct cause of death sufficient to impose criminal liability).

In *Commonwealth v. Cheeks*, 423 Pa. 67, 223 A.2d 291 (1966), the victim was stabbed in the abdomen by the defendant during a robbery. The stabbing necessitated an operation which resulted in complications including abdominal distention. As a result of the victim's post-operative condition, tubes were inserted through the victim's nostrils and into his stomach. The victim was disoriented, uncooperative and confused and pulled out the tubes on several occasions. Finally, he pulled out a tube, gagged and asphyxiated. The defendant in *Cheeks* argued that the stab

wound was not the cause of death and that the victim's own actions had intervened as an independent act of causation. The supreme court disagreed. The court found that "the fact that the stabbing was not the immediate cause of death is not controlling". 423 Pa. at 73, 223 A.2d at 294. The stabbing was an operative link in a chain of events which resulted in the victim's death. The court saw defendant's conduct as the cause which necessarily triggered the series of events which ended in the victim's death.

However, causation-in-fact, the "but for" element of assessing the causal connection, alone will not necessarily determine criminal culpability.[4] If it did, little would distinguish tort liability from criminal liability. Our cases emphasize that a criminal conviction requires "a more direct causal connection" than tort concepts. *See Commonwealth v. Howard, supra,* 265 Pa.Super. at 539, 402 A.2d at 676. Thus not only do we demand that the defendant's conduct actually cause the victim's death in that "it is an antecedent but for which the result in question would not have occurred", we also question, in cases such as the instant one, whether the fatal result was so extraordinary, remote or attenuated that it would be unfair to hold the defendant

---

**4.** In explaining the inadequacy of the but-for inquiry in assessing ultimate criminal liability, the comments to the Model Penal Code use the following illustration to demonstrate a causal connection which might satisfy the but-for test but which, due to remoteness of result, would not constitute legally sufficient causation:

For example, if the defendant attempted to shoot his wife, with the result that she retired to her parents' country home and died there from falling off a horse, no one would think that he should be held guilty for murder, though he did intend her death and his attempt to kill her was a but-for cause of her encounter with the horse. Further questions must be asked and it is the nature of those questions that is critical. The Institute decided that they should not be posed in terms of the encrusted precedents on proximate causation, by reference to doctrines of dependent supervening and independent supervening causes, and so on. The proper inquiry is not merely factual, but concerns the propriety of allowing the result to influence the criminality of the defendant or the gravity of his crime.

Model Penal Code § 2.03, Comments at 258 (emphasis added).

criminally responsible for it.[5]

 In our view, it is this second prong of the causation inquiry which is in fact at issue when our cases impose a "stricter" or "more direct" test for criminal causation than is needed for tort liability. *See Commonwealth v. Paquette*, 451 Pa. 250, 254, 301 A.2d 837, 839 (1973) ("A defendant's actions are the legal cause of death if they are a direct and substantial factor in bringing it about. This is a stricter test than the 'proximate cause' test of tort law....") (citations omitted); *Commonwealth v. Howard, supra*, 265 Pa.Super. at 539, 402 A.2d at 676 (criminal conviction requires a "more direct causal connection" than tort liability). Thus, the defendant's conduct must bear a direct and substantial relationship to the fatal result in

5. Section 303 of the Crimes Code, which deals with the concept of causation, reads in pertinent part:

(a) **General rule.**—Conduct is the cause of a result when:

(1) it is an antecedent but for which the result in question would not have occurred; and

(2) the relationship between the conduct and result satisfies any additional causal requirements imposed by this title or by the law defining the offense.

\* \* \* \* \* \*

(c) **Divergence between probable and actual result.**—When recklessly or negligently causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of negligence, of which he should be aware unless:

(2) the actual result involves the same kind of injury or harm as the probable result and is not too remote or accidental in its occurrence to have bearing on the liability of the actor or on the gravity of his offense.

This section is derived from the Model Penal Code § 2.03 which explains its import as follows:

[These subsections] are based on the theory that but-for causation is the only strictly causal requirement that should be imposed generally, and that the remaining issue is the proper scope of liability in light of the actor's culpability.

Model Penal Code § 2.03, Comment at 260.

The crimes code does not, nor did the Model Penal Code, attempt to catalogue every conceivable divergent event which could occur to vary the actual result from the intended or hazarded result of the actor's conduct. The section is deliberately formulated in a general way in order to allow the trier of fact to use its common sense in deciding whether the actual result has bearing on the actor's culpability or whether the result was too remote to have such bearing.

order to impose criminal culpability. Put another way, if the fatal result was an unnatural or obscure consequence of the defendant's actions, our sense of justice would prevent us from allowing the result to impact on the defendant's guilt.

This concept is often addressed in terms of foreseeability. For instance, in *Commonwealth v. Skufca, supra,* in which a parent was held to have legally caused the death of her children who died of smoke inhalation after being trapped in a room by their mother, the court noted: "Although suffocation due to the fire was the immediate cause of the children's death, appellant's unlawful conduct in leaving them locked in the room, without supervision, for several hours, susceptible to numerous foreseeable dangers, was the legal cause of their death." 457 Pa. at 133, 321 A.2d at 894.

Likewise in *Commonwealth v. Paquette, supra,* the court found the defendant's actions were the legal cause of an infant's death where the blows the baby sustained resulted in a comatose state which in turn led to pneumonia which was the immediate cause of death. In *Paquette,* the court stated: "Such occurrences are not uncommon. A defendant cannot escape the natural consequences of his act merely because of foreseeable complications." 451 Pa. at 254, 301 A.2d at 839.

In *Commonwealth v. Lang,* 285 Pa.Super. 34, 426 A.2d 691 (1981), this court found that a police officer's death during a high speed pursuit of a fleeing defendant on a motorcycle was a "foreseeable" and direct consequence of the defendant's conduct and "not a fortuitous or coincidental event". 285 Pa.Super. at 44, 426 A.2d at 696. In *Lang,* we found that "[the defendant] knew or should have known that his actions, speeding and attempting to elude arrest, were likely to result in injury to someone: either to himself, to some innocent third party, or to the pursuing police officer." 285 Pa.Super. at 44, 426 A.2d at 695–696.

In contrast to the above-cited and similar cases, is *Commonwealth v. Colvin,* 340 Pa.Super. 278, 489 A.2d 1378

(1985) wherein the actual result was so remote and fortuitous that it must be said to have no bearing on the defendant's culpability. In *Colvin,* this court reversed an involuntary manslaughter conviction due to insufficiency of evidence on causation. In that case, the defendant threw a stone at a house, breaking a window. The noise the mischief made was heard by only one member of the household. That person immediately informed his mother, who had not heard the stone hit the house, about what had just happened and the mother collapsed and died. Implicit in the court's finding that the causal connection was not "direct" enough, is an appreciation that that the fatal result was so remote and attenuated from the risks hazarded by the defendant's unlawful conduct in throwing the stone, that it had no "bearing on the liability of the actor or on the gravity of his offense." 18 Pa.C.S.A. § 303(c)(2).

In light of the foregoing principles, we examine appellant's claim that the evidence at trial was insufficient to establish the necessary causal connection between his conduct and Berry's resulting death. Appellant first contends that the argument he was having with Berry was over by the time she approached Michielli's car for aid and that, therefore, her actions in seeking refuge in the station wagon cannot be attributed to him. Berry's actions were not provoked by his assault but were spontaneous and unrelated to the "earlier dispute", appellant argues, and therefore, his conduct cannot be said to have caused her death.

This argument that there was no dispute occurring at the time Berry ran to Michielli's car is belied by considerable evidence which, when viewed in the light most favorable to the Commonwealth, establishes quite the contrary. As described above, several witnesses testified to the ferocity and tenacity of appellant's assault on Berry and all the observations attested to occurred within minutes of Berry's death. Campbell testified that he saw Berry shouting and running for help. He said appellant punched Berry in the head no more than two minutes before she fell to her death

beneath the wheels of the car. Smith, Campbell and the Michiellis all testified that Berry's actions right up until the instant of her death were accompanied by cries for help, a fact which completely refutes appellant's claim that her actions were not taken in response to his conduct. Finally, Mrs. Michielli stated that when Berry approached their car, appellant was chasing her and was right behind her. Appellant's contention that the "dispute" had ended is wholly without support in the record.

Appellant further argues that Berry's death occurred through such an unforeseeable chain of events that his conduct cannot be said to have caused the fatal result. We disagree. The evidence at trial plainly established that appellant subjected Berry to a brutal and persistent assault from which she continually attempted to escape. In the first place, it is completely natural and foreseeable that any victim of an assault would respond to the danger by trying to escape it. In fact, it is difficult to imagine behavior which is more responsive or more predictable than fleeing from a deadly assault. Moreover, Berry's actions were particularly likely in the context of the instant case. Berry was clearly intent upon escaping her assailant at any cost and attempted to do so repeatedly. She tried climbing out of the car window, only to be beaten and pulled back into the car. She ran away from appellant twice after that and each time was violently forced back into the car by appellant. Just before Berry escaped for the last, and fatal, time, the cab was seen moving along the street with the passenger door open. The risk that Berry might suffer serious injury or death either during the assault or in her attempt to avoid it, was inherent in the situation appellant's attack created. In our view, the fatal result of appellant's assault is not rendered unforeseeable merely because the precise agency of death, i.e. the Michielli's station wagon, could not have been foretold. Appellant perpetrated a deadly assault on the decedent in and around an automobile on a public street with other moving vehicles in close proximity. It is absurd to argue that the fatal result was

so extraordinary or accidental that appellant should not be held criminally liable for the consequences of his conduct. We find that more than sufficient evidence was adduced at trial from which the factfinder could conclude that appellant's conduct was the legal cause of Berry's death.[6]

Appellant also contends that the evidence was insufficient to prove malice, an essential element of third degree murder. Malice is defined as a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." *Commonwealth v. Pigg*, 391 Pa.Super. 418, 428, 571 A.2d 438, 443 (1990), *appeal denied*, 525 Pa. 644, 581 A.2d 571 (1991). Malice may be inferred from all the circumstances surrounding the conduct of the accused. *Commonwealth v. Petrino*, 332 Pa.Super. 13, 480 A.2d 1160, *cert. denied*, 471

---

**6.** An analogous case arose from the widely known incident in Howard Beach, New York, in which several white teenagers assaulted and threatened three black men. In the course of the assault, which the appeals court found was "motivated solely by the color of the victims' skin", several youths relentlessly chased Michael Griffith. *People v. Kern*, 149 A.D.2d 187, 239, 545 N.Y.S.2d 4, 37 (1989), *affirmed*, 75 N.Y.2d 638, 555 N.Y.S.2d 647, 554 N.E.2d 1235 (1990). Griffith was forced to retreat by jumping a barricade and attempting to cross a well-travelled, six-lane highway. A passing motorist collided with Griffith, killing him. On appeal, the defendants in the Howard Beach case, like appellant here, argued that the evidence on causation was legally insufficient both because their chase had ended and because the motorist's intervention rendered their conduct too remote a cause of death to warrant criminal liability. The court emphatically rejected these arguments:

> [I]t was the defendants' wrongful conduct which forced Griffith to seek refuge from his assailants by crossing the highway....
> [T]he only reasonable alternative left open to Griffith while being persistently chased and threatened by the defendants and their friends, several of whom were carrying weapons, was to seek safety by crossing the parkway where he unfortunately met his death. Clearly, on the basis of these facts, it cannot be said that the defendants' despicable conduct was not a sufficiently direct cause of Griffith's death. The defendants will not be heard to complain that, in desperately fleeing their murderous assault, Griffith chose the wrong escape route.

*People v. Kern*, 149 A.D.2d at 212–213, 545 N.Y.S.2d at 20.

Likewise, in the instant case, appellant will not be heard to complain that Berry chose the wrong vehicle in which to seek asylum from his persistent assault.

U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1974). Finally, in instances where fists are used in an assault, whether malice may be inferred depends on the particular circumstances, such as the size of the assailant, the manner in which the fists were used, the ferocity of the attack, its duration and the existence of any provocation. *Commonwealth v. Moore*, 488 Pa. 361, 412 A.2d 549 (1980).

We conclude that the factfinder had more than sufficient evidence upon which to base a finding of malice beyond a reasonable doubt. Appellant was witnessed repeatedly and relentlessly beating Berry about the face and head. Appellant's attack forced Berry to pursue foolhardy, indeed fatal, attempts at escape. After Berry climbed out the cab window, appellant pursued her and attacked her while she was on the ground. He then lifted her and pummelled her against the car. Berry's pleas for him to stop and pleas for help did not restrain appellant. Even after Berry had escaped from the moving cab, appellant was seen punching her in the head and chasing her into traffic. Appellant's assault was both continuing and fierce. Evidence from the eyewitnesses was corroborated by the medical examiner's report which revealed numerous head injuries consistent with the blows dealt by appellant's fists. In light of these factors, it is clear that malice was established beyond a reasonable doubt.

Judgment of sentence affirmed.