J-S78019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BEAU W. CHERMER | |
| Appellant | No. 128 WDA 2016 |

Appeal from the Judgment of Sentence October 19, 2015
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0001125-2012
CP-04-CR-0001130-2012

BEFORE:  BENDER, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                                **FILED MARCH 14, 2017**

Beau W. Chermer appeals from the judgment of sentence imposed on October 19, 2015, in the Court of Common Pleas of Beaver County. At Docket No. 1125-2012, the trial judge[1] found Chermer guilty of murder of the second degree.[2] At Docket No. 1130-2012, Chermer pled guilty to 16 counts arising from the same incident, including aggravated assault,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Although Chermer and his co-defendant, Joseph Arlott, were tried together, after the mistrial was granted and the new trial rescheduled, Chermer opted for a bench trial.

[2] 18 Pa.C.S. § 2502(b).

burglary, robbery, criminal conspiracy, and related offenses.[3]  Chermer was

sentenced to life in prison without the possibility of parole and a consecutive

aggregate term 19 to 50 years' imprisonment on three conspiracy

convictions, namely, conspiracy to commit robbery, conspiracy to commit

aggravated assault, and conspiracy to commit burglary.[4]  Chermer claims

(1) the trial court erred in imposing sentence on more than one of the

conspiracy charges,[5] (2) the trial court erred in denying Chermer's motion

and amended motion to bar retrial on double jeopardy grounds and other

constitutional grounds, (3) the evidence was insufficient to sustain the

verdict for murder in the second degree, (4) the evidence was against the

weight of the evidence to support the conviction for murder in the second

degree, and (5) the trial court erred in failing to strike the Commonwealth's

rebuttal testimony of James Smith, M.D.  Based upon the following, we

affirm the judgment of sentence at Docket No. 1125-2012, and vacate the

judgment of sentence at Docket No. 1130-2012 and remand for

resentencing.

_____

[3]  18 Pa.C.S. §§ 2701(a)(1), 3502(a)(1), 3701(a)(1)(i) and 903, respectively.

[4] The trial court opted not to sentence Chermer on any of the other counts to which he pled guilty.  **See** Sentence Order, 10/19/2015.

[5]  The trial court has agreed that it erred in sentencing Chermer consecutively on the three counts of conspiracy and has asked this Court to vacate that sentence and remand for resentencing.  For purposes of our discussion, we will address this issue last.

The trial court has summarized the facts and procedural history of this case, as follows:

On August 26, 2015, the Court returned a verdict finding [Chermer] guilty of Murder of the Second Degree (Felony Murder) at Case No. 1125 of 2012. Prior to trial, [Chermer] had waived his right to a trial by jury and agreed to be tried at Case No. 1125 of 2012 in a Bench Trial. Also before trial, [Chermer] plead[ed] guilty to all sixteen (16) counts at Case No. 1130 of 2012, arising out of the same incident. The counts at Case No. 1130 of 2012, which [Chermer] plead[ed] guilty to, include: (1) Aggravated Assault, (2) Criminal Conspiracy to Commit Aggravated Assault, (3) Aggravated Assault, (4) Criminal Conspiracy to Commit Aggravated Assault, (5) Burglary, (6) Criminal Conspiracy to Commit Burglary, (7) Robbery, (8) Criminal Conspiracy to Commit Robbery, (9) Unlawful Restraint, (10) Criminal Conspiracy to Commit Unlawful Restraint, (11) Theft by Unlawful Taking, (12) Criminal Conspiracy to Commit Theft by Unlawful Taking, (13) Simple Assault, (14) Criminal Conspiracy to Commit Simple Assault, (15) False Imprisonment, and (16) Criminal Conspiracy to Commit False Imprisonment. On the first case, [Chermer] was sentenced on October 19, 2015 to life in prison without the possibility of parole. On the second case, [Chermer] received three (3) separate sentences for Criminal Conspiracy to Commit Robbery, Criminal Conspiracy to Commit Aggravated Assault and Criminal Conspiracy to Commit Burglary, each to be served consecutively. The aggregate sentence for the three (3) convictions required [Chermer] to undergo imprisonment for not less than nineteen (19) years, nor more than fifty (50) years, each to be served consecutively to the life imprisonment sentence at Case No. 1125 of 2012.[1] [Chermer] received no additional sentences for the other thirteen (13) counts he plead[ed] guilty to at Case No. 1130 of 2012.

_____

[1] Specifically, for the conviction of Criminal Conspiracy to Commit Robbery, [Chermer] was sentenced to undergo imprisonment in a State Penal or Correctional Institution or Facility for not less than 102 months nor more than 240 months; for the conviction of Criminal Conspiracy to Commit Aggravated Assault, [Chermer] was sentenced to

undergo imprisonment for not less than 84 months nor more than 240 months; and for the conviction of Criminal Conspiracy to Commit Burglary, [Chermer] was sentenced to undergo imprisonment for not less than 42 months nor more than 120 months; each sentence was required to be served consecutively to each other.

_____

Following the sentencing, [Chermer] filed an Omnibus Post-Sentence Motion on October 26, 2015, requesting judgment of acquittal to be entered on the Second Degree Murder charge and requesting the sentences for the Conspiracy charges to be vacated, and only one (1) sentence for conspiracy be imposed. Chermer then filed a Supplemental Omnibus Post-Sentence Motion o[n] December 23, 2015, requesting judgment of acquittal for the Murder conviction, a new trial for the Murder conviction, and a motion for modification of sentence for the Conspiracy convictions. This Court denied that motion on January 4, 2016. [Chermer] then filed this direct appeal to the Superior Court of Pennsylvania.

****

At trial, the Court heard testimony from multiple medical professionals regarding the cause of the victim's (Daniel J. Santia) death. After being tortured and beaten by [Chermer] and the Co-Defendant[2] during a home invasion, the eighty-one (81) year old victim suffered a traumatic brain injury. The victim was found the day after the attack and was rushed to the hospital. Testimony provided that the victim suffered from a pre-existing heart condition, requiring him to take Coumadin, a blood thinner, to prevent blood clots. Due to the severe brain injury, the treating physicians suspended the victim's normal medication and briefly took him off of the Coumadin to help treat the brain trauma. Testimony provided by Doctor Christina Toevs, the Medical Director of the Trauma Intensive Care Unit of Allegheny General Hospital, explained that it was customary to stop prescribing Coumadin for thirty (30) days following severe brain injuries in patients. The victim ultimately died twenty-one (21) days after the brutal attack.

_____

2 The Co-Defendant in this case is Joseph Michael Arlott, who was convicted by a jury of all counts at Case No. 1126 of 2012 and at Case No. 1127 of 2012.

_____

The Commonwealth's Forensic Pathologist, Doctor James Smith, determined the cause of death to be from acute myocardial infarction, as a direct result of the trauma that had occurred to the victim's brain twenty-one (21) days previously. While all parties agreed that the victim's pre-existing heart condition played a role in his death, experts disagreed that the brain trauma was the underlying cause of the victim's death. Commonwealth witnesses and experts all provided that the brain injury is what placed the victim in the hospital and what eventually caused his death. Doctor Smith explicitly stated that the brain trauma was the direct cause of the victim's death. (Tr. Transcr. Vol. V, 127-208 (Aug. 21, 2015). There was no doubt that [Chermer] and Co-Defendant [Arlott] caused the victim's extensive brain trauma. [Chermer's] Forensic [Expert], Doctor Cyril Wecht, on the other hand, testified that it was his opinion that the victim's death was not the result of the brain trauma, and that he believed the evidence showed that the brain injury had mostly healed and played no role in the victim's death.

This Court returned a verdict of guilty for the Second Degree Murder charge.

Trial Court Opinion, 2/23/2016, at 1-2, 3-5.

Chermer first claims the trial court erred in denying his motion to dismiss the charges against him on double jeopardy grounds. Our scope and standard of review for this question is as follows: "An appeal grounded in double jeopardy raises a question of constitutional law. This [C]ourt's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo.*" **Commonwealth v. Taylor**, 120 A.3d 1017, 1020 (Pa. Super. 2015) (citation omitted). Further,

- 5 -

the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

**Commonwealth v. Smith**, 615 A.2d 321, 325 (Pa. 1992).[6]

Here, Detective Robert Chamberlain, of the District Attorney's Office, testified he had taken a series of photographs of the victim when he visited him in the hospital some weeks after the assault. These photographs showed the victim, still alive, to be severely bruised and battered. In the midst of Detective Chamberlain's testimony, lead detective Greg Durkos, of the Hopewell Police Department, informed one of the prosecuting attorneys he believed he had taken the photographs shortly after the victim's admission into the hospital. Indeed, prior to Detective Chamberlain's testimony, ADA Frank Martocci expressed a concern regarding when the photographs had been taken, believing they depicted fresher injuries. N.T. Trial, 1/29/2014 at 191. Accordingly, in attempting to authenticate the photographs, Detective Chamberlain, while believing he had taken the pictures, could not accurately date the pictures and stated he would have to check the time signature on his computer at his office.

---

[6] In **Smith**, our Supreme Court broadened the double jeopardy protection provided by the federal courts and United States Constitution, which requires the prosecution to have intentionally caused a mistrial through misconduct. **See Oregon v. Kennedy**, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

After the close of testimony for the day, Detective Durkos conclusively demonstrated he had taken the pictures by examining the relevant information contained on his computer. The next day, the Commonwealth alerted both the defense and trial court to the problem. The Commonwealth also offered to present testimony to the jury detailing the mistake and thereby correcting any misimpression Detective Chamberlain's testimony caused. However, the defense requested a mistrial and the trial court granted it.

Subsequently, Chermer and Arlott sought to bar retrial on the ground of double jeopardy.[7] An extensive hearing on the issue was held on March 24, 2014 at which both Detectives Durkos and Chamberlain testified. In denying the motion to bar a retrial, the trial court stated in its March 31, 2014,[8] opinion:

> Based upon all the evidence presented and the argument of counsel, this Court finds no reason to change the Court's Opinion and Order of February 18, 2014 on the issue of intentional misconduct by the prosecution in permitting Detective Chamberlain to attempt to authenticate the twenty (20) photographs which he clearly did not take. As pointed out in the February 18, 2014 Opinion, the prosecution's preparation for

---

[7] Chermer initially filed an interlocutory appeal regarding the double jeopardy issue. However, the interlocutory appeal was quashed by *per curiam* order, dated September 22, 2014. Our Supreme Court subsequently denied allowance of appeal, **see** 112 A.3d 649 (Pa. 2015) (Table).

[8] The trial court authored two opinions regarding the double jeopardy issue, having granted reconsideration after initially denying the motion to bar a retrial. The March 31, 2014 opinion is the second of the opinions.

trial is suspect and did bring about the trial error, however, that conduct has not been proven to rise to the level of having been committed purposefully or in bad faith with the intent to prevent the Defendants from receiving a fair trial, it did not constitute an intentional attempt to deny or subvert the Defendants' constitutional rights, and it certainly was not a trial strategy undertaken to provoke he Defendants into seeking a mistrial. This Court cannot ignore the fact that the inaccurate testimony was called to everyone's attention by the Commonwealth itself. As to the first ground raised, the defendants have not established grounds to require the barring of re-trial on Double Jeopardy grounds.

Trial Court Opinion, 3/31/2014 at 3.

We have reviewed the certified record, including the relevant notes of testimony from the initial trial and the hearing on the motion to bar a retrial. We find no error in the trial court's conclusion. Chermer has presented no evidence or argument to overcome the fact that the Commonwealth came forward itself to disclose the problem, a problem that might never have been evident without that disclosure. In order to prevail on this claim, Chermer must demonstrate that the Commonwealth acted intentionally in trying to provoke a mistrial or in attempting to deny him a fair trial. The trial court determined that such improper intent was inconsistent with self-disclosure and denied Chermer relief. We affirm that decision.

Next, Chermer argues there was insufficient evidence to support his conviction of second-degree murder. Specifically, he claims the

Commonwealth failed to prove a sufficient nexus between the assault of the victim and his demise.[9]

> The standard of review for claims of insufficient evidence is well-settled. With respect to such claims, we consider the evidence in the light most favorable to the Commonwealth as verdict winner. In that light, we decide if the evidence and all reasonable inferences from that evidence are sufficient to establish the elements of the offense beyond a reasonable doubt.

*Commonwealth v. Thur*, 906 A.2d 555, 568-69 (Pa. Super. 2006) (citation omitted).

> The Crimes Code defines murder of the second degree as follows:

> **(b) Murder of the second degree.--**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

18 Pa.C.S. § 2502(b).

> Chermer's claim of insufficiency is a challenge to causation.

> To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability. *Commonwealth v. Long*, 425 Pa. Super. 170, 624 A.2d 200, 203-204 (1993), *appeal denied*, 535 Pa. 170, 633 A.2d 150 (1993) (*citing* *Commonwealth v. Rementer*, 410 Pa. Super. 9, 598 A.2d 1300, 1304 (1991), *appeal denied*, 533 Pa. 599, 617 A.2d 1273 (1992)).

> In *Rementer*, we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have

---

[9] Because Chermer pled guilty to all the underlying crimes, including burglary, aggravated assault, and robbery, the only real issue at trial was whether the assault caused the victim's death.

occurred. ***Rementer***, 598 A.2d 1305; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." ***Rementer***, 598 A.2d at 1305, n. 3 (*quoting* LaFave and Scott, *Substantive Criminal Law,* Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible. ***Rementer***, 598 A.2d at 1305.

As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. ***Rementer***, 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." ***Long***, 624 A.2d at 203 (*citing* ***Commonwealth v. Skufca***, 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. ***Id***. (*citing* ***Rementer*** and ***Commonwealth v. Pacquette***, 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." ***Id***. at 204, 624 A.2d 200 (*citing* ***Rementer***, 598 A.2d at 1306-1307).

***Commonwealth v. Nunn***, 947 A.2d 756, 760 (Pa. Super. 2008).

There is no dispute the victim suffered from medical problems prior to the assault, including arthrosclerosis, here, the near total occlusion of three coronary arteries. While the victim's medical problems were predominantly chronic, the autopsy discovered a fresh blood clot that had completely

occluded one of the arteries, causing a myocardial infarction,[10] which proved to be the mechanism of death.

It is also beyond dispute that the victim suffered a severe beating in the course of the home invasion by Chermer and co-defendant Arlott. Of primary import to this appeal, the victim suffered a subarachnoid hemorrhage – bleeding on the brain. In order to treat this potentially fatal injury, the doctors had to stop the Coumadin regimen the victim had been on to treat his severe heart condition. Coumadin is a blood thinner that helps prevent the formation of blood clots. Essentially, the doctors had to stop the bleeding on the brain and could only do so by allowing the blood to clot naturally at the site of the brain injury. However, this course of action increased the risk of the formation of other blood clots. As noted above, another blood clot did form, occluded an artery, and killed the victim. The central question of the trial was whether the formation of the fatal blood clot was linked to the beating or was the formation of the blood clot 21 days between the assault and the victim's demise too attenuated. The resolution of this question rested upon the testimonial evidence of Dr. James Smith, the forensic pathologist who conducted the victim's autopsy, and Dr. Cyril

_____

[10] Myocardial infarction is the technical name for a heart attack. The Cleveland Clinic, Center for Continuing Education, states: "Myocardial infarction occurs when myocardial ischemia, a diminished blood supply to the heart, exceeds a critical threshold and overwhelms myocardial cellular repair mechanisms designed to maintain normal operating function and homeostasis." *See* www.clevelandclinicmeded.com

Wecht, the forensic pathologist who reviewed the matter on behalf of the defendants. Dr. Smith testified the assault and death were linked, while Dr. Wecht opined the victim had essentially recovered from the beating, rendering the assault and myocardial infarction unrelated.

Specifically, Chermer argues:

The Trial Court recites that its verdict was based on the opinion of the Commonwealth's expert, [Dr.] Smith, that the brain trauma [the victim] suffered was the direct cause of his death. However, [Dr.] Smith never rendered that opinion.

[Dr.] Smith's actual testimony was that [the victim] had recovered from the injuries caused by the beating and that the injuries were not the cause of, nor a contributing factor in, [the victim's] death.

Chermer's Brief, at 40.

The certified record leads to the conclusion that this argument is meritless. Dr. Smith's direct testimony spans 53 pages of the notes of testimony. *See* N.T. Trial, 8/21/2015, at 127-180. Dr. Smith summed up his opinion in the following manner:

A: Okay. That [the victim] "died as the result of an acute myocardial infarct, secondary to a recent thrombosis of the coronary artery vein graft. The infarct was imposed in a heart already severely damaged from coronary artery disease and in a state of chronic congestive failure. The circumstances relating to his death were directly related to a severe beating he received some 20 days prior to his death."

The manner of death is homicide.

Q: Now you've talked about both of those things that we've been talking about throughout your testimony –

A: Um-hum.

Q: - the heart condition and the severe beating that he took. You said they are directly connected. Why do you say there in your opinion that they are directly connected?

A: The, well, they're, a lot of the features we've already, we have already talked about and discussed there are the business, most obvious being the business about the coagulation and the use of the anticoagulant there. The anticoagulant therapy having to be discontinued and this leading to the thrombosis in the vein graft followed by an acute myocardial infarct and his death, okay.

There, of course, as we've mentioned or as we've touched upon in the other testimony there's the fact that his stasis, I mean his being unable to move about and so forth also contributed to this.

His congestive heart failure also contributed to this.

Again I don't like to prolong it, but there was, the incident where he had to be intubated was at least in part related to a condition from his being placed in a, the position that he was for over 12 hours where he was bound with his hands tied behind his back. His legs were bound. He was, he was in one position and couldn't get out of it for many, many hours.

This leads to, especially with heart failure, leads to stasis, that means fluids going to the lower part of the body. It causes, and this is a direct cause of, a direct result of this is muscle necrosis, and one of the, one of, the primary protein in muscles, protein called myoglobulin, it's very damaging to the kidneys. That was secreted. His kidneys were damaged.

The kidney, because the kidneys were damaged, why he retains fluid, and because he retains fluid, why he goes into severe congestive heart failure and has to be intubated.

Probably that episode also helped to get, give him the pneumonia that he got on May 7th and all of those things sort of tie together.

He was a man who had been living with this, these coronary artery bypasses for 34 years. He had been doing well, and now with the intervention of the trauma that he suffered why this is,

this has, I feel, is part of, all a part and parcel of a cause, a cause of his death.

Q: And do you see any break in that chain from the time that he had the, was the victim of the assault up until the time of his death?

A: No, I don't.

Q: And also from the time that you review those reports on April 30th until the time of his death do you see any indication in those records or in your exams that he ever totally recovered or fully recovered –

A: Fully recovered?

Q: - from those injuries?

A: No, definitely not. I don't feel he had ever fully recovered, no.

N.T. Trial, 8/21/2015, at 176-180.

In summary, the testimony of Dr. Smith drew an unbroken chain of events from the beating to death, and the judge was free to believe his testimony as to causation. As such, Chermer's argument regarding insufficiency of the evidence fails and he is not entitled to relief on this issue.

Next, Chermer argues the verdict was against the weight of the evidence. Specifically, he argues Dr. Smith failed to quantify how much more likely it was for a blood clot to form absent the Coumadin therapy and did not address Dr. Wecht's theory of changed hematological state until rebuttal. Also, he argues the trial court failed to properly weigh the effect of the "do not resuscitate" (DNR) order placed by the decedent's family.

Our Supreme Court has set forth detailed instructions regarding the review of a challenge to the weight of the testimony.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Widmer***, 560 Pa. 308, 319, 744 A.2d 745, 751-52 (2000); ***Commonwealth v. Brown***, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, 560 Pa. at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " ***Id.*** at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 538 Pa. at 435, 648 A.2d at 1189.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
>> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* ***Brown***, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> ***Widmer***, 560 Pa. at 321-22, 744 A.2d at 753 (emphasis added).

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013).

- 15 -

Essentially, Chermer's argument regarding his challenge to the weight of the evidence is to highlight the fact that Dr. Wecht disagreed with Dr. Smith as to certain medical issues. As *Clay* instructs, this is an improper basis to overturn a verdict. Here, the trial court determined Dr. Smith's opinion was supported by the testimony of the treating physicians. Additionally, the trial court opined:

> This Court returned a verdict of guilty for the Second Degree Murder charge. This Court had the opportunity during trial to weigh the credibility of all the witnesses and evidence presented at trial and determined which evidence it found most compelling. This Court found, and the jury in the Co-Defendant's case agreed, that the Commonwealth presented sufficient evidence to support a conviction for Second Degree Murder. Likewise, the verdict is also not against the weight of the evidence. The verdict shows that the Court found the Commonwealth's witnesses more compelling, and that testimony, on its own, supports the conviction finding [Chermer's] actions caused the victim's death.
>
> ****
>
> Similarly, this conviction does not "shock one's sense of justice" and is not against the weight of the evidence presented.

Trial Court Opinion, 2/23/2016, at 5.

Based upon the foregoing, the trial court did not abuse its discretion in denying Chermer's claim the verdict was against the weight of the evidence.[11]

_____

[11] As noted above, as part of his weight of the evidence claim, Chermer also asserts the trial court failed to adequately account for the DNR order placed by the victim's family. Our review of the certified record shows there was no

*(Footnote Continued Next Page)*

Penultimately, Chermer claims the trial court erred in failing to strike the rebuttal testimony of Dr. James Smith.

> Our standard of review in cases involving the admission of expert testimony is broad: "Generally speaking, the admission of expert testimony is a matter left largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion."

***Commonwealth v. Watson***, 945 A.2d 174, 176 (Pa. Super. 2008) (citation omitted).

On rebuttal, Dr. Smith disagreed with Dr. Wecht's conclusion that the fatal myocardial infarction took place too long after the beating and cessation of Coumadin to be related. In explaining why he disagreed, he enlarged his prior testimony, explaining the clotting process and how removal from Coumadin effects said process. Although he did not reiterate his opinions were made to a reasonable degree of medical certainty, the trial court examined the testimony as a whole and determined Dr. Smith's rebuttal testimony was not rendered incompetent by that fact.

While this issue purports to challenge Dr. Smith's rebuttal testimony, the first half of Chermer's argument is a repeat of his prior argument that Dr. Smith's direct testimony was insufficient. Repeating this argument has not compelled us to reconsider its merits.

---

*(Footnote Continued)* ───────────

medical evidence to support a claim that the DNR order had **any** effect upon the medical outcome of this matter.

- 17 -

Chermer is correct that Dr. Smith did not repeat the fact that his rebuttal testimony was provided within a reasonable degree of medical certainty. However, Dr. Smith's testimony from the Commonwealth's case in chief was given to that standard. The trial court also noted that rather than focusing on "magic words,"

> "the substance of the testimony presented by the expert must be reviewed to determine whether the opinion rendered was based on the requisite degree of certainty and not on mere speculation." [**Commonwealth v. Miller**, 987 A.2d 638, 656 (Pa. 2009)].

Trial Court Opinion, 2/23/16, at 8 (additional citations omitted).

The trial court recognized that Dr. Smith's initial testimony had been explicitly rendered to a reasonable degree of medical certainty and reviewed the detail of his rebuttal testimony to determine the rebuttal testimony was proffered to the same standard and was not based on mere speculation. Our review of the certified record leads us to conclude the trial court did not abuse its discretion therein. Accordingly, Chermer is not entitled to relief on this claim.

In his last issue, Chermer argues he was sentenced illegally in regards to the conspiracy charges. The trial court has agreed with Chermer; we agree as well.

Specifically, Chermer received an aggregate sentence of 19 to 50 years' incarceration for conspiracy to commit robbery (8½ to 20 years),

conspiracy to commit aggravated assault (7 to 20 years), and conspiracy to

commit burglary (3½ to 10 years). However, 18 Pa.C.S. § 903 (c) states:

> If a person conspired to commit a number of crimes, he is guilty of one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship.

18 Pa.C.S. § 903 (c).

> The trial court reasoned:

> To determine if one or multiple conspiracies have been established, the Court should apply a totality of the circumstances test and consider the following factors:

>> The number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

> **Com[monwealth]. v. Davis**, 704 A.2d 650, 654 (Pa. Super. 1997). This test has been consistently followed by the Superior Court and adopted as the proper test by the Supreme Court of Pennsylvania. **See e.g. Com[monwealth] v. Andrews**, 768 A.2d 309, 334 (Pa. 2001); **see also Com[monwealth] v. Barnes**, 871 A.2d 812, 820 (Pa. Super. 2005).

> Noting the applicable test to apply, this Court finds it would be proper to re-sentence [Chermer] at Case No. 1130 of 2012, and sentence [Chermer] for a single Conspiracy. Applying the test to the facts at hand, this Court agrees the evidence established one Conspiracy, as the crimes committed were all the object of a single "continuous conspiratorial relationship." [Chermer's] re-sentence should reflect as much.

Trial Court Opinion, 2/23/2016, at 11.

Our review of the certified record confirms the trial court's analysis.

Accordingly, Chermer is properly subject to a single sentence for these three

conspiracy charges. Therefore, we vacate the sentence at Docket No. 1130-2012 and remand this matter for resentencing.

Judgment of sentence at Docket No. 1125-2015, for second-degree murder, is affirmed. Judgment of sentence at Docket No. 1130-2012 is vacated as to Chermer's aggregate sentence on the charges of conspiracy to commit robbery, conspiracy to commit aggravated assault and conspiracy to commit burglary, and remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2017