J-S78018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSEPH MICHAEL ARLOTT | |
| Appellant | No. 1999 WDA 2015 |

Appeal from the Judgment of Sentence October 19, 2015
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0001126-2012
CP-04-CR-0001127-2012

BEFORE: BENDER, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                        **FILED MARCH 14, 2017**

Joseph Michael Arlott appeals from the judgment of sentence imposed on October 19, 2015, in the Court of Common Pleas of Beaver County. At Docket No. 1126-2012, the jury found Arlott guilty of murder of the second degree.[1] At Docket No. 1127-2012, the jury convicted Arlott of aggravated assault, burglary, robbery, criminal conspiracy, and related offenses.[2] Arlott was sentenced to life in prison without the possibility of parole and a consecutive aggregate term 19 to 50 years' imprisonment on three

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. §§ 2701(a)(1), 3502(a)(1), 3701(a)(1)(i) and 903, respectively.

conspiracy convictions, namely, conspiracy to commit robbery, conspiracy to commit aggravated assault, and conspiracy to commit burglary. With regard to his conviction for second-degree murder, Arlott challenges the sufficiency and weight of the evidence. Arlott also claims two of the conspiracy sentences should be vacated as each conspiracy count represented only one object and agreement. Based upon the following, we affirm the judgment of sentence at Docket No. 1126-2012, and vacate the judgment of sentence at Docket No. 1127-2012 and remand for resentencing.

The trial court has summarized the facts and procedural history of this case, as follows:

> On August 26, 2015, the impaneled jury returned a unanimous verdict finding [Arlott] guilty of seventeen (17) counts on two different cases. At Case No. 1126 of 2012, the jury found [Arlott] guilty of Murder of the Second Degree (Felony Murder). At Case No. 1127 of 2012, the jury found [Arlott] guilty of (1) Aggravated Assault, (2) Burglary, (3) Robbery, (4) Criminal Conspiracy to Commit Aggravated Assault, (5) Criminal Conspiracy to Commit Burglary, (6) Criminal Conspiracy to Commit Robbery, (7) Aggravated Assault with a Deadly Weapon, (8) Criminal Conspiracy to Commit Aggravated Assault with a Deadly Weapon, (9) Theft by Unlawful Taking, (10) Criminal Conspiracy to Commit Theft by Unlawful Taking, (11) Unlawful Restraint, (12) Criminal Conspiracy to Commit Unlawful Restraint, (13) Simple Assault, (14) False Imprisonment, (15) Criminal Conspiracy to Commit Simple Assault, and (16) Criminal Conspiracy to Commit False Imprisonment. On the first case, [Arlott] was sentenced on October 19, 2015 to life in prison without the possibility of parole. On the second case, [Arlott] received three (3) separate sentences for Criminal Conspiracy to Commit Robbery, Criminal Conspiracy to Commit Aggravated Assault and Criminal Conspiracy to Commit Burglary, each to be served consecutively. The aggregate sentence for the three (3) convictions required [Arlott] to undergo imprisonment for not less than nineteen (19) years, nor more than fifty (50) years,

each to be served consecutively to the life imprisonment sentence at Case No. 1126 of 2012.[1]

_____

[1] Specifically, for the conviction of Criminal Conspiracy to Commit Robbery, [Arlott] was sentenced to undergo imprisonment in a State Penal or Correctional Institution or Facility for not less than 102 months nor more than 240 months, for the conviction of Criminal Conspiracy to Commit Aggravated assault, [Arlott] was sentenced to undergo imprisonment for not less than 84 months nor more than 240 months; and for the conviction of Criminal Conspiracy to Commit Burglary, [Arlott] was sentenced to undergo imprisonment for not less than 42 months nor more than 120 months; each sentence was required to be served consecutively to each other.

_____

Following the sentencing, [Arlott] filed a Post-Sentence Motion on October 26, 2015, requesting Judgment of Acquittal to be entered on the Second Degree Murder charge and requesting the sentences for the Conspiracy charges to be vacated. This Court denied that Motion on October 27, 2015. [Arlott] then filed a Motion to Allow Filing of Notice of Appeal *Nunc Pro Tunc*, which was granted on December 14, 2015. [Arlott] then filed this direct appeal to the Superior Court of Pennsylvania.

****

At trial, the jury heard testimony from multiple medical professionals regarding the cause of the victim's (Daniel J. Santia) death. After being tortured and beaten by [Arlott] and Co-Defendant [Beau W. Chermer] during a home invasion, the eighty-one (81) year old victim suffered a traumatic brain injury. The victim was found the day after the attack and was rushed to the hospital. Testimony provided that the victim suffered from a pre-existing heart condition, requiring him to take Coumadin to prevent heart attacks and blood clots. Due to the severe brain injury, the treating physicians suspended the victim's normal medication and briefly took him off of the Coumadin to help treat the brain trauma. Testimony provided by Doctor Christina Toevs, the Medical Director of the Trauma Intensive Care Unit of Allegheny General Hospital, explained that it was customary to

- 3 -

stop prescribing Coumadin for thirty (30) days following severe brain injuries in patients. The victim ultimately died twenty-one (21) days after the brutal attack.

The Forensic Pathologist on the case, Doctor James Smith, determined the cause of death to be from acute myocardial infarction, as a direct result of the trauma that had occurred to the victim's brain twenty-one (21) days previously. While all parties agreed that the victim's pre-existing condition played a role in his death, experts disagreed that the brain trauma was the underlying cause of the victim's death. Commonwealth witnesses and experts all provided that the brain injury is what placed the victim in the hospital and what eventually caused his death. Doctor Smith explicitly stated that the brain trauma was the direct cause of the victim's death. Defense Expert, Doctor Cyril Wecht, on the other hand, testified that it was his opinion that the victim's death was not the result of the brain trauma, and that he believed the evidence showed that the brain injury had mostly healed and played no role in the victim's death.

The jury in this case, acting as the fact-finder, deliberated for several hours before coming to a unanimous verdict.

Trial Court Opinion, 1/28/2016, at 1-2, 3-5.

Arlott challenges the sufficiency and weight of the evidence to sustain his conviction for second degree murder, contending that the Commonwealth failed to present sufficient evidence as to causation of death. Specifically, he argues the victim had survived the injuries sustained in the home invasion attack and "had been stabilized and released from trauma treatment at the time of his death. [The victim] had a long history of coronary disease and died of a heart attack. The Commonwealth's evidence fails to establish the causal connection required to sustain the conviction of murder." Arlott's Brief at 12.

We first address Arlott's sufficiency challenge.

The standard of review for claims of insufficient evidence is well-settled. With respect to such claims, we consider the evidence in the light most favorable to the Commonwealth as verdict winner. In that light, we decide if the evidence and all reasonable inferences from that evidence are sufficient to establish the elements of the offense beyond a reasonable doubt.

*Commonwealth v. Thur*, 906 A.2d 555, 568-69 (Pa. Super. 2006) (citation omitted).

The Crimes Code defines murder of the second degree as follows:

**(b) Murder of the second degree.--**A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

18 Pa.C.S. § 2502(b).

Arlott's claim of insufficiency is a challenge to causation.

To establish criminal causation, the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability. *Commonwealth v. Long*, 425 Pa. Super. 170, 624 A.2d 200, 203-204 (1993), *appeal denied*, 535 Pa. 170, 633 A.2d 150 (1993) (*citing Commonwealth v. Rementer*, 410 Pa. Super. 9, 598 A.2d 1300, 1304 (1991), *appeal denied*, 533 Pa. 599, 617 A.2d 1273 (1992)).

In *Rementer*, we set forth a two-part test for determining criminal causation. First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. *Rementer*, 598 A.2d 1305; 18 Pa.C.S.A. § 303(a)(1). A victim's death cannot be entirely attributable to other factors; rather, there must exist a "causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place." *Rementer*, 598 A.2d at 1305, n. 3 (*quoting* LaFave and Scott, *Substantive Criminal Law,* Vol. 1, Ch. 3., at 391–392 (1986)). Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would

unfair to hold the defendant criminally responsible. **Rementer**, 598 A.2d at 1305.

As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. **Rementer**, 598 A.2d at 1305. "Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result." **Long**, 624 A.2d at 203 (*citing* **Commonwealth v. Skufca**, 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974)). The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. **Id**. (*citing* **Rementer** and **Commonwealth v. Pacquette**, 451 Pa. 250, 301 A.2d 837 (1973)). "Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt." **Id**. at 204, 624 A.2d 200 (*citing* **Rementer**, 598 A.2d at 1306-1307).

**Commonwealth v. Nunn**, 947 A.2d 756, 760 (Pa. Super. 2008).

There is no dispute the victim suffered from medical problems prior to the assault, including arthrosclerosis, here, the near total occlusion of three coronary arteries. While the victim's medical problems were predominantly chronic, the autopsy discovered a fresh blood clot that had completely occluded one of the arteries, causing a myocardial infarction,[3] which proved to be the mechanism of death.

_____

[3] Myocardial infarction is the technical name for a heart attack. The Cleveland Clinic, Center for Continuing Education, states: "Myocardial infarction occurs when myocardial ischemia, a diminished blood supply to the heart, exceeds a critical threshold and overwhelms myocardial cellular

*(Footnote Continued Next Page)*

It is also beyond dispute that the victim suffered a severe beating in the course of the home invasion by Arlott and co-defendant Chermer. Of primary import to this appeal, the victim suffered a subarachnoid hemorrhage – bleeding on the brain. In order to treat this potentially fatal injury, the doctors had to stop the Coumadin regimen the victim had been on to treat his severe heart condition. Coumadin is a blood thinner that helps prevent the formation of blood clots. Essentially, the doctors had to stop the bleeding on the brain and could only do so by allowing the blood to clot naturally at the site of the brain injury. However, this course of action increased the risk of the formation of other blood clots. As noted above, another blood clot did form, occluded an artery, and killed the victim. The central question of the trial was whether the formation of the fatal blood clot was linked to the beating or was the formation of the blood clot 21 days between the assault and the victim's demise too attenuated. The resolution of this question rested upon the testimonial evidence of Dr. James Smith, the forensic pathologist who conducted the victim's autopsy, and Dr. Cyril Wecht, the forensic pathologist who reviewed the matter on behalf of the defendants. Dr. Smith testified the assault and death were linked, while Dr. Wecht opined the victim had essentially recovered from the beating, rendering the assault and myocardial infarction unrelated.

*(Footnote Continued)* ───────────────

repair mechanisms designed to maintain normal operating function and homeostasis." ***See*** www.clevelandclinicmeded.com

Our review of the certified record leads to the conclusion that Dr. Smith's testimony provided ample basis to support Arlott's second-degree murder conviction. Dr. Smith's direct testimony spans 53 pages of the notes of testimony. *See* N.T. Trial, 8/21/2015, at 127-180. Dr. Smith summed up his opinion in the following manner:

> A: Okay. That [the victim] "died as the result of an acute myocardial infarct, secondary to a recent thrombosis of the coronary artery vein graft. The infarct was imposed in a heart already severely damaged from coronary artery disease and in a state of chronic congestive failure. The circumstances relating to his death were directly related to a severe beating he received some 20 days prior to his death."
>
> The manner of death is homicide.
>
> Q: Now you've talked about both of those things that we've been talking about throughout your testimony –
>
> A: Um-hum.
>
> Q: - the heart condition and the severe beating that he took. You said they are directly connected. Why do you say there in your opinion that they are directly connected?
>
> A: The, well, they're, a lot of the features we've already, we have already talked about and discussed there are the business, most obvious being the business about the coagulation and the use of the anticoagulant there. The anticoagulant therapy having to be discontinued and this leading to the thrombosis in the vein graft followed by an acute myocardial infarct and his death, okay.
>
> There, of course, as we've mentioned or as we've touched upon in the other testimony there's the fact that his stasis, I mean his being unable to move about and so forth also contributed to this.
>
> His congestive heart failure also contributed to this.

Again I don't like to prolong it, but there was, the incident where he had to be intubated was at least in part related to a condition from his being placed in a, the position that he was for over 12 hours where he was bound with his hands tied behind his back. His legs were bound. He was, he was in one position and couldn't get out of it for many, many hours.

This leads to, especially with heart failure, leads to stasis, that means fluids going to the lower part of the body. It causes, and this is a direct cause of, a direct result of this is muscle necrosis, and one of the, one of, the primary protein in muscles, protein called myoglobulin, it's very damaging to the kidneys. That was secreted. His kidneys were damaged.

The kidney, because the kidneys were damaged, why he retains fluid, and because he retains fluid, why he goes into severe congestive heart failure and has to be intubated.

Probably that episode also helped to get, give him the pneumonia that he got on May 7th and all of those things sort of tie together.

He was a man who had been living with this, these coronary artery bypasses for 34 years. He had been doing well, and now with the intervention of the trauma that he suffered why this is, this has, I feel, is part of, all a part and parcel of a cause, a cause of his death.

Q: And do you see any break in that chain from the time that he had the, was the victim of the assault up until the time of his death?

A: No, I don't.

Q: And also from the time that you review those reports on April 30th until the time of his death do you see any indication in those records or in your exams that he ever totally recovered or fully recovered –

A: Fully recovered?

Q: - from those injuries?

A: No, definitely not. I don't feel he had ever fully recovered, no.

N.T. Trial, 8/21/2015, at 176-180.

In summary, the testimony of Dr. Smith drew an unbroken chain of events from the beating to death, and the jury was free to believe his testimony as to causation. As such, Arlott's argument regarding insufficiency of the evidence fails and he is not entitled to relief on this issue.

Nor do we find merit in the argument of Arlott that the second-degree murder conviction was against the weight of the evidence.

The law pertaining to weight of the evidence claims is well-settled.

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751-52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 A.2d at 319-20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id.** at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Brown**, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of*

*whether the verdict is against the weight of the evidence*. ***Brown***, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 560 Pa. at 321-22, 744 A.2d at 753 (emphasis added).

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013).

Here, the trial court opined: "The jury had the opportunity during deliberations to weigh the credibility of all the witnesses and evidence presented at trial and determined which evidence it found most compelling." Trial Court Opinion, 1/28/2016, at 5. The jury listened to the experts for both the Commonwealth and defense and chose to believe Dr. Smith. The jury, as factfinder, was entitled to believe all, some of none of Dr. Smith's testimony. ***See Commonwealth v. Sloan***, 67 A.3d 808, 814 (Pa. Super. 2013). The trial court concluded that "[t]he verdict here definitely does not shock one's sense of justice." ***Id***. Moreover, Arlott presents **no** argument to demonstrate that the trial court abused its discretion in rejecting his weight claim, and we discern none on this record. Therefore, Arlott's weight claim fails.

Lastly, Arlott contends the consecutive sentences for conspiracy to commit aggravated assault and conspiracy to commit burglary should be vacated as each conspiracy count represented only one object and agreement. The trial court agreed with Arlott's position, and the Commonwealth is in agreement with the trial court.

Specifically, Arlott received an aggregate sentence of 19 – 50 years' incarceration for conspiracy to commit robbery (8½ to 20 years), conspiracy to commit aggravated assault (7 to 20 years) and conspiracy to commit burglary (3½ to 10 years). However, 18 Pa.C.S.§ 903(c) states:

> If a person conspired to commit a number of crimes, he is guilty of one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship.

18 Pa.C.S. § 903(c).

The trial court reasoned as follows:

> To determine if one or multiple conspiracies have been established, the Court should apply a totality of the circumstances test and consider the following factors:
>
> > The number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.
>
> **Com[monwealth]. v. Davis**, 704 A.2d 650, 654 (Pa. Super. 1997). This test has been consistently followed by the Superior Court and adopted as the proper test by the Supreme Court of Pennsylvania. **See e.g. Com[monwealth] v. Andrews**, 768 A.2d 309, 334 (Pa. 2001); **see also Com[monwealth] v. Barnes**, 871 A.2d 812, 820 (Pa. Super. 2005).

- 12 -

Noting the applicable test to apply, this Court finds it would be proper to resentence [Arlott] at Case No. 1127 of 2012, and sentence [Arlott] according to one (1) conspiracy count. Applying the test to the facts at hand, this Court holds the evidence established one conspiracy as the crimes committed were all the object of a single "continuous conspiratorial relationship." [Arlott's] sentence should reflect as much.

Trial Court Opinion, 1/28/2016, at 6.

Our review of the certified record confirms the trial court's analysis. Accordingly, Arlott is properly subject to a single sentence for these conspiracy charges. Therefore, we vacate the sentence at Docket No, 1127-2012 and we remand for resentencing.

Judgment of sentence at Docket No. 1126-2012, regarding murder in the second degree is affirmed. Judgment of sentence at Docket No. 1127-2012 is vacated as to Arlott's aggregate sentence on the charges of conspiracy to commit robbery, conspiracy to commit aggravated assault, and conspiracy to commit burglary, and remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2017

- 13 -