J-S41045-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THOMAS STEPHEN KEOGH | : | |
| | : | |
| Appellant | : | No. 585 MDA 2022 |

Appeal from the Judgment of Sentence Entered November 10, 2021
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0001882-2019

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED JANUARY 06, 2023**

Appellant Thomas Stephen Keogh appeals from the judgment of sentence entered by the Court of Common Pleas of Franklin County after a jury convicted Appellant of delivery of a controlled substance, corrupt organizations, drug delivery resulting in death ("DDRD"), and criminal use of communication facility. Appellant challenges the sufficiency and weight of the evidence supporting his DDRD conviction and asserts that the trial court abused its discretion in imposing his sentence. We affirm.

Appellant was charged with the aforementioned offenses in connection with the untimely death of L.S. ("Child"), a three-year-old girl who ingested methamphetamine and buprenorphine that was in the possession of Child's mother, Brittany Higgins and her boyfriend, Brian Phillip Bennett. Appellant

_____

[*] Former Justice specially assigned to the Superior Court.

was accused of acting as the supplier for the drug distribution network that delivered the methamphetamine that Child accessed before her death.

Appellant and Bennett proceeded to a joint trial which commenced on December 8, 2021.[1] The trial court set forth the tragic factual background in this case in great detail in its March 21, 2022 opinion. We will summarize the relevant facts which were developed over multiple days at the joint trial.

On Saturday, January 6, 2018, emergency personnel were summoned to an apartment in Greencastle Borough based on the report of an "unconscious toddler." Notes of Testimony (N.T.), Trial, 9/8/21, at 23. When emergency medical technicians (EMTs) arrived, they discovered Child lifeless, lying on her back on a bed in a bedroom near the kitchen. *Id*. at 34-35.

The autopsy of Child's body was conducted by Dr. Samuel Land, who found no evidence of significant injury, disease, infection, bacteria, virus, or organisms that could have been responsible for Child's death. *Id*. at 95-119. Dr. Land sent samples of Child's blood for toxicological testing, which revealed Child had methamphetamine (18 nanograms/milliliter) and buprenorphine in her system (1.2 nanograms/milliliter). *Id*. at 67-68, 80, 95-97.

Methamphetamine is a stimulant that is almost always used illegally, which can elevate blood pressure and temperature, and can lead to seizures or misfiring of the heart. *Id*. at 96, 116. Buprenorphine is a semi-synthetic

---

[1] Higgins entered a *nolo contendere* plea to third-degree murder and received a sentence of ten to twenty years' imprisonment. As discussed *infra*, several individuals entered guilty pleas connected to their participation in the corrupt organization which delivered the methamphetamine that Child ingested.

opioid used to treat opioid abuse and withdrawal symptoms, similar to methadone. *Id*. at 72, 96-97, 99. Buprenorphine is sold as Subutex or Suboxone in tablets that dissolve under the tongue. *Id*. at 72, 99.

Based on his professional training, education, and experience, Dr. Land concluded with a reasonable degree of medical certainty that Child's cause of death was mixed substance toxicity of methamphetamine and buprenorphine, neither of which was prescribed to Child. *Id*. at 114-117. Dr. Land indicated that either drug could have been lethal to Child, but stated there was no way to differentiate which drug ultimately caused her death. *Id*. at 102.

When presented with Child's toxicology reports, Higgins and Bennett confessed they were high on methamphetamine ("meth") the night of January 5, 2018 to the morning of January 6, 2018, the time period in which Child ingested the drugs. *Id*. at 30-33. Higgins and Bennett regularly used drugs in the home they shared with Higgins' two children: L.H., her nine-year old son, and Child, her three-year old daughter. *Id*. at 30, 43-46. While Higgins was prescribed Suboxone and Bennett was prescribed Subutex, the couple would share both of these drugs. *Id*. at 50-51, 112-13, 117, 129.

Higgins testified that she purchased meth on January 5, 2018 from Rodney (Allen) Mower, who delivered it to their residence at 5:00 p.m. *Id*. at 32-33, 47-48. Higgins conceded that she and Bennett bought meth to share together on numerous occasions from Mower and other individuals. *Id*. at 47, 87-88. As Mower had just received a large amount of meth from his supplier, Mower cut the meth on their kitchen table to measure it out into individual

packages. *Id*. at 69-76. When asked if the action of cutting the meth had left "teeny tiny particles … on [her] kitchen table at some point that Friday night," Higgins admitted it was possible. *Id*. at 76.

Higgins did not discover Child had died until the evening of Saturday, January 6, 2018 when she went into Child's bedroom at 8 p.m. to wake her up. *Id*. at 49. At that point, Higgins had not seen Child for more than 24 hours since she injected the meth the previous evening and had not checked on her. *Id*. When Higgins discovered Child was cold, stiff, and unresponsive, Higgins used her cell phone to call 9-1-1. *Id*. at 63.

After Child's death, investigators sought to identify and prosecute the individuals responsible for delivering the meth that Child ingested. Troopers interviewed Mower, who admitted selling meth to Higgins and Bennett on January 5, 2018 and also shared details of the meth distribution chain. N.T., 9/13/21, at 51-52. Mower agreed to pled guilty to DDRD for the death of Child, was sentenced to four to ten years' imprisonment, and entered a cooperation agreement to testify for the Commonwealth. *Id*. at 46-47.

At the joint trial, Mower testified that he sold Higgins and Bennett meth on multiple occasions, including January 5, 2018, when he delivered a quarter gram of meth to Higgins. *Id*. at 52, 62. On the times Mower had delivered meth to Higgins and Bennett, he noticed children around and had observed Higgins and Bennett using meth in their home. *Id*. at 53-55.

Mower received the meth he delivered to Higgins and Bennett on January 5, 2018 on the same day from Paul (Larry) Crawford. *Id*. at 71.

Crawford had been Mower's source of meth for approximately six months to a year. *Id*. at 73. Mower would go to Crawford's residence once a week to stock up with a few grams of meth to sell. *Id*. at 75. Mower indicated that Crawford also supplied meth to Brittany Baker, Kelly Monn, Dan Schultz, and Michael Gatrell, who all sold meth to support their own drug habits. *Id*. at 77-78, 93.

Mower knew that Crawford obtained his meth from Appellant, a mutual acquaintance who lived in Connecticut. *Id*. at 79, 83, 85. Mower had introduced Crawford to Appellant in State College in 2017, as Crawford "had funds available" after receiving a settlement. *Id*. at 81. The men did drugs together and arranged for Crawford to receive meth from Appellant. *Id*. at 82.

After officers arrested Mower, they continued to investigate the meth supply chain to determine who was responsible for and profited from the drug sale that led to Child's death. In addition to Mower, the Commonwealth presented the testimony of Baker, Monn, and Schultz, all of whom admitted to selling meth they received from Crawford.[2] N.T., 9/9/21, at 178-96; N.T., 9/10/21, at 61; N.T., 9/13/21, at 156, 161. Baker, Monn, and Schultz testified

---

[2] All three individuals entered guilty pleas in connection with their roles in the corrupt organization that delivered the meth which led to Child's death. Baker pled guilty to conspiracy (corrupt organizations) and intercepting communication, served two years' incarceration, and was on parole at the time of trial. N.T. 9/9/21, at 170-72. Monn pled guilty to corrupt organizations, perjury, and disclosing intercepted communications, served a prison sentence, and was on parole. N.T. 9/10/21, at 45-46. Schultz plead guilty to criminal use of a communication device and was awaiting sentencing. N.T., 9/13/21, at 155. The fourth individual who sold drugs for Crawford, Michael Gatrell, entered a guilty plea and agreed to testify against Appellant, but Gatrell passed away in June 2021 before the joint trial. N.T., 9/14/21, at 155.

that Crawford received meth in the mail each week from an individual in Connecticut or in Florida. N.T., 9/9/21, at 199-201; N.T., 9/10/21, at 68; N.T., 9/13/21, at 171, 177. The packages would be addressed to Damien Crawford, Crawford's dog. N.T., 9/10/21, at 67-69; N.T., 9/13/21, at 177.

Monn also identified Appellant as Crawford's meth supplier. N.T., 9/10/21, at 53, 56-57, 61. In his guilty plea, Monn confirmed he met Appellant on a trip to State College with Mower and Crawford in 2017 where he learned that Appellant was a source of meth. *Id*. at 52-53, 78. Monn recalled that on one occasion, Crawford arranged for a package of meth from Appellant to be sent to Monn's residence. *Id*. at 61-66. Monn and Schultz testified separately that Crawford had directed each of them to wire money to "Thomas Keogh" in an amount of several thousand dollars. *Id*. at 74, 77; N.T., 9/13/21, at 163.

During Schultz's testimony, the Commonwealth introduced items that police recovered from Crawford's home, including, but not limited to, drug paraphernalia and priority mail envelopes addressed to Damien Crawford from Connecticut and Wellington, Florida. N.T., 9/13/21, at 177, 180.

The prosecution also offered the testimony of Crawford, who admitted to leading a meth distribution network in Franklin County in which Mower, Monn, Gatrell, and Schultz acted as drug runners. N.T., 9/14/21, at 6-7, 25.[3] As Crawford supplied meth to his sellers on a regular basis, Crawford indicated

---

[3] Crawford entered a negotiated guilty plea to corrupt organizations, conspiracy, and delivery of a controlled substance in which he would receive a sentence of 5½ to 11 years' imprisonment. Crawford had not yet been sentenced at the time of trial. N.T., 9/14/21, at 177, 180.

the operation steadily grew and became "too much" to handle. *Id*. at 26-27. Crawford shared that he "freaked out" when he learned of Child's death, which led him to stop selling meth. *Id*. at 17-20.

Crawford revealed that Appellant was his meth supplier. *Id*. at 25, 28-29. Crawford confirmed that Mower had introduced him to Appellant in State College in 2017 after which the men established a business relationship in which Appellant would send Crawford meth to sell. *Id*. at 27, 55-58. Appellant would ship meth from Connecticut where he lived, but also shipped meth from Wellington, Florida. *Id*. at 32-33, 58-59. Crawford would use the name of his dog, Damien, on the packages as to not implicate himself. *Id*. at 42.

Crawford regularly sent money to Appellant through a wire transfer at Walmart or directed Monn, Schultz, or Gatrell to do it for him. *Id*. at 47-48. When Crawford received packages from Appellant, Crawford put the meth in a safe in his bathroom. *Id*. at 50. On one occasion, Crawford had a package delivered from Appellant to Monn as Crawford was out of town. *Id*. at 50-51.

The investigators presented evidence of wire transfers, cell phone records, and mail delivery records to corroborate Crawford's testimony implicating Appellant as his source of meth. *Id*. at 144-52, 218-31. In addition, a search of Appellant's Amazon account revealed purchases of scales, baggies, a butane torch, butane capsules, eyedropper glass bottles, tin cases, and vacuum seal bags. *Id*. at 228-29.

At conclusion of the trial, the jury convicted Appellant on all charges. On November 10, 2021, the trial court imposed an aggregate sentence of 12

years, 1 month to 24 years, 2 months' incarceration.[4] Appellant filed timely

post-sentence motions, which the trial court denied on March 16, 2022. This

timely appeal followed.

Appellant raises the following issues for our review on appeal:

1. Whether the trial court erred in denying [Appellant's] motions for judgment of acquittal, motion in arrest of judgment, and motions for a new trial based on the Commonwealth failed [sic] to prove a substantial causal relationship between the actions of [Appellant] and the death of [Child?]

2. Whether the aggregate sentence imposed on the offenses was manifestly excessive, harsh, and an abuse of discretion[?]

3. Whether the trial court erred in imposing a sentence in the aggravated range of the sentencing guidelines without stating proper reasons on the record[?]

Appellant's Brief, at 5 (renumbered for ease of review).

In the first two issues, Appellant challenges the sufficiency and weight

of the evidence supporting his DDRD conviction. We begin by noting the

difference between sufficiency and weight claims:

The distinction between a claim challenging the sufficiency of evidence and a claim challenging the weight of evidence is critical. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but claims that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." A claim challenging the sufficiency of the evidence, however, asserts that there is insufficient evidence to support at

_____

[4] Bennett was convicted of involuntary manslaughter, delivery of a controlled substance and related charges. Bennett received an aggregate sentence of 15 to 30 years' imprisonment. Bennett's appeal (docketed at 615-616 MDA 2022) has been resolved in a separate decision.

least one material element of the crime for which Appellant has been convicted.

***Commonwealth v. Arias***, ___A.3d ___, 2022 PA Super 202 (Pa.Super. 2022)

(quoting ***Commonwealth v. Lyons***, 833 A.2d 245, 258 (Pa.Super. 2003)

(citation omitted)).

When reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno***, 14 A.3d 133 (Pa.Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. ***Commonwealth v. Hartzell***, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno***, ***supra*** at 136.

***Commonwealth v. Juray***, 275 A.3d 1037, 1042 (Pa.Super. 2022) (citations

omitted).

The Crimes Code provides that an individual commits the crime of Drug Delivery Resulting in Death (DDRD) "if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance ... in violation of [35 P.S. § 780-113(a)(14) or (30)], and another person dies as a result of using the substance." 18 Pa.C.S.A. § 2506(a).[5]

---

[5] The Controlled Substance, Drug, Device, and Cosmetic Act criminalizes the delivery of a controlled substance by an individual who is not registered or licensed to do so. ***See*** 35 P.S. § 780-113(a)(30).

Methamphetamine is a Schedule II controlled substance. **See** 35 P.S. § 780-104(2)(iii)(4).

In other words, the crime of DDRD "consists of two principal elements: (i) [i]ntentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance and (ii) death caused by ('resulting from') the use of that drug." **Commonwealth v. Kakhankham**, 132 A.3d 986, 991-92 (Pa.Super. 2015) (some quotation marks omitted).

As noted above, although the Commonwealth is required to prove that the defendant acted intentionally with respect to the drug delivery, the Commonwealth only needs to show the defendant acted recklessly in causing the death. This Court recently held that:

> [T]he applicable *mens rea* for the crime of drug delivery resulting in death is two-fold. First, the delivery, distribution or sale of the contraband must be intentional. Second, the actual death must be the reckless result of the actions of the defendant. **Id**. at 995. As such, the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband.

**Commonwealth v. Burton**, 234 A.3d 824, 830 (Pa.Super. 2020) (citing **Commonwealth v. Carr**, 227 A.3d 11, 16-17 (Pa. Super. 2020)).

Specifically, in this case, Appellant concedes that the Commonwealth proved that he intentionally delivered meth to Crawford. However, Appellant argues that there was insufficient evidence that his conduct was a legal cause of Child's death.

Appellant's argument has three subparts, which we will address together. First, Appellant suggests the Commonwealth failed to prove that the meth Child ingested came from the packages that he sent to Crawford. Appellant argues that Crawford and Mower obtained meth from other suppliers and Higgins and Bennett bought drugs from dealers other than Mower.

Second, Appellant asserts that even if he supplied the meth that Child ingested, the prosecution failed to establish the exact cause of death since the autopsy revealed that Child's cause of death was mixed substance toxicity of meth and buprenorphine. As such, Appellant claims the prosecution failed to prove which drug caused Child's death. Appellant also suggests that Child died as a result of the neglect and reckless conduct of her guardians, Higgins and Bennett, in allowing her access to drugs.

Third, Appellant suggests that it was not foreseeable to Appellant that his conduct would result in the "death of a 3-year-old child two states away from his residence after he delivered drugs to Larry Crawford who was the methamphetamine kingpin of Franklin County." Appellant's Brief, at 14.

In reviewing similar claims, this Court has held that:

> "It is undisputed that the Commonwealth must prove a *direct* causal relationship between the acts of a defendant and the victim's death." ***Commonwealth v. Long****,* 425 Pa.Super. 170, 624 A.2d 200, 203 (1993). "Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor producing the death." ***Commonwealth v. McCloskey****,* 835 A.2d 801, 807 (Pa.Super. 2003) (citing ***Commonwealth v. Nicotra****,* 425 Pa.Super. 600, 625 A.2d 1259, 1260 (1993)). "This is true even though 'other factors combined with that conduct to achieve the result.'" ***Id.*** Additionally:

In order to impose criminal liability, causation must be direct and substantial. Defendants should not be exposed to a loss of liberty based on the tort standard which only provides that the event giving rise to the injury is a substantial factor. Although typically the tort concept refers to only substantial and not to direct and substantial as in the criminal context, the additional language in the criminal law does not provide much guidance. Therefore, criminal causation has come to involve a case-by-case social determination; i.e., is it just or fair under the facts of the case to expose the defendant to criminal sanctions. In other words, was the defendant's conduct so directly and substantially linked to the actual result as to give rise to imposition of criminal liability or was the actual result so remote and attenuated that it would be unfair to hold the defendant responsible for it?

***Commonwealth v. Rementer***, 410 Pa.Super. 9, 598 A.2d 1300, 1304–05 (1991). "In seeking to define the requirement that a criminal defendant's conduct be a direct factor in the death of another, the courts of this Commonwealth have held that 'so long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility for the crime of homicide may properly be found.'" ***McCloskey***, 835 A.2d at 808 (citing ***Nicotra***, *supra*).

\*\*\*

"[***I***]*t has never been the law of this Commonwealth that criminal responsibility must be confined to a sole or immediate cause of death*." ***Commonwealth v. Skufca***, 457 Pa. 124, 321 A.2d 889, 894 (1974) (citation omitted). "***Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result***." ***Id***.

***Fabian***, 60 A.3d at 152 (emphasis added).

Our review of the record in this case in the light most favorable to the Commonwealth shows that the prosecution met its burden of proving beyond a reasonable doubt that Appellant's conduct was a direct and substantial factor in causing Child's death.

As Child's autopsy revealed her cause of death was mixed substance toxicity of methamphetamine (18 nanograms/milliliter) and buprenorphine in her system (1.2 nanograms/milliliter), Dr. Land, the forensic pathologist, could not say with absolute certainty which of the two drugs definitively caused Child's death. However, Dr. Land opined that Child's ingestion of meth was likely lethal. Dr. Land emphasized that "[m]ethamphetamine is a very, very, very dangerous drug" with "lethal toxic side effects." N.T., 9/8/21, at 120-21. Dr. Land testified that in conducting over 10,000 autopsies, he has observed numerous deaths caused by meth. *Id*. at 121-22.

There was sufficient evidence to show Appellant was the source of the meth that Child accessed shortly before her death. Child's guardians, Higgins and Bennett admitted that they purchased meth from Mower (Crawford and Appellant's drug runner) on the evening of January 5, 2018, just hours before Child was found lifeless in her bed.

Mower agreed that he delivered meth to Higgins' home on January 5, 2018, which was the same day he received a supply of meth from Crawford. Despite Appellant's allegations to the contrary, Crawford, who admitted to his role in the corrupt organization did not indicate that he received meth from anyone other than Appellant.

Higgins and Bennett testified that Mower cut a large amount of methamphetamine on their kitchen table, an area accessible to Child. Although Higgins and Bennett claimed Child was behind a baby gate when the meth was delivered, they admitted that after Child was placed in her bedroom

- 13 -

that night to go to sleep, Child could leave her bedroom and was not restricted from entering the kitchen. Higgins and Bennett began to use the meth, put Child to bed, and did not check on her until the following day. Bennett testified that there were no other sources of meth in the home other than the amount he and Higgins purchased from Mower that evening.

Despite the fact that no individual witnessed Child accessing meth before her death, the jury was free to consider the circumstantial evidence to conclude that Child ingested meth that had been delivered by Mower, an individual who sold meth on behalf of a corrupt organization that Appellant supplied with illegal drugs.

To the extent that Appellant suggests that his liability should be limited as it was not foreseeable that his conduct would cause the death of a three-year-old, we reject Appellant's claim that Child's death was a result so remote and attenuated that it would be unfair to hold Appellant responsible.

Rather, Appellant's conduct started the chain of causation which led to the victim's death. Appellant supplied meth to Crawford, when neither men had the license or authorization to do so. Appellant and Crawford's exchanges of meth were part of a network that distributed the drug to users throughout Franklin County to make a profit. The delivery of this dangerous controlled substance, which is nearly always used in an illegal manner, was made to admitted drug addicts who were responsible for the care of children. Child accessed the meth that was delivered by Appellant's corrupt organization.

Reviewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to allow the jury to infer that Appellant's reckless conduct caused Child's death. Therefore, there is no merit to his sufficiency challenge.

Second, Appellant asserts that the trial court erred in denying his motion for a new trial when his DDRD conviction is against the weight of the evidence. Our standard of review for challenges to the weight of the evidence is well-established:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa.Super. 2017) (citations omitted).

Appellant combines his bald assertion that his DDRD conviction is against the weight of the evidence with his sufficiency analysis arguing that the Commonwealth failed to prove a causal connection between Appellant's

conduct and Child's death. As noted above, we conclude that the Commonwealth met its burden to prove the necessary elements to sustain the DDRD conviction.

While Appellant cites to the correct standard of review for a challenge to the weight of the evidence, Appellant does not include any separate discussion to provide factual or legal support to his theory that the trial court abused its discretion in denying this claim.

Moreover, our review of the record in this case does not reveal any evidence that would lead us to believe that the trial court abused its discretion in concluding that Appellant failed to show that the jury's verdict resulted in such an injustice that a new trial was required. ***See Windslowe***, ***supra***. As such, Appellant's weight claim must fail.

Lastly, Appellant claims the trial court abused its discretion in imposing a sentence in the aggravated range without stating proper reasons on the record. In reviewing challenges to the trial court's sentencing discretion, we are mindful that:

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Manivannan*, 186 A.3d 472, 489 (Pa.Super. 2018) (quotation marks, some citations, and emphasis omitted).

Appellant filed a timely notice of appeal and a post-sentence motion, which included a claim that his sentence was excessive. However, Appellant's brief does not contain a statement of the reasons relied upon for appeal with respect to the discretionary aspects of sentence pursuant to Pa.R.A.P. 2119(f).

It is well-established that:

> [w]hen challenging the discretionary aspects of sentence, an appellant must include in his or her brief a separate concise statement demonstrating that there is a substantial question as to the appropriateness of the sentence under the Sentencing Code. If the Commonwealth objects to the appellant's failure to comply with Pa.R.A.P. 2119(f), the sentencing claim is waived for purposes of review.

*Commonwealth v. Griffin*, 149 A.3d 349, 353 (Pa.Super. 2016) (quoting *Commonwealth v. Montgomery*, 861 A.2d 304, 308 (Pa.Super. 2004) (citations omitted)).

As the Commonwealth has objected to the fact that Appellant's brief does not contain a Rule 2119(f) statement, we deem Appellant's challenges to the discretionary aspects of his sentence to be waived.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>01/06/2023</u>