J-S41036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
BRIAN PHILIP BENNETT :
:
Appellant : No. 615 MDA 2022

Appeal from the Judgment of Sentence Entered November 10, 2021
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0000782-2018

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
BRIAN PHILLIP BENNETT :
:
Appellant : No. 616 MDA 2022

Appeal from the Judgment of Sentence Entered November 10, 2021
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0001927-2018

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED JANUARY 06, 2023**

Appellant Brian Phillip Bennett appeals from the judgment of sentence

entered by the Court of Common Pleas of Franklin County after a jury

convicted Appellant of involuntary manslaughter, endangering the welfare of

a child (two counts), delivery of a controlled substance, criminal use of a

_____

[*] Former Justice specially assigned to the Superior Court.

J-S41036-22

communication facility, and possession of drug paraphernalia. Appellant challenges the sufficiency and weight of the evidence supporting his involuntary manslaughter conviction and asserts that the trial court abused its discretion in imposing his sentence. We affirm.

Appellant was charged with third-degree murder along with the aforementioned offenses in connection with the untimely death of L.S. ("Child"), the three-year-old daughter of Appellant's girlfriend, Brittany Higgins. As discussed *infra*, Child died after ingesting methamphetamine and buprenorphine, which Appellant and Higgins admitted to possessing.[1] Appellant proceeded to a joint jury trial along with Thomas Stephen Keogh, the individual accused of acting as the supplier for the drug distribution ring that ultimately sold and delivered the drugs that led to Child's death.[2]

The tragic factual background in this case was described in great detail by the trial court in its March 21, 2022 opinion. We will summarize the undisputed facts that were developed over multiple days at Appellant's trial.

_____

[1] Higgins, who was charged as a co-defendant, entered a *nolo contendere* plea to third-degree murder and received a sentence of ten to twenty years' imprisonment for her role in Child's death. Higgins entered a cooperation agreement with the prosecution and testified against Appellant at his trial.

[2] Keogh was convicted of delivery of a controlled substance, corrupt organizations, drug delivery resulting in death, and criminal use of communication facility. Keogh received an aggregate sentence of 12 years, 1 month to 24 years, 2 months' incarceration. Keogh's appeal (docketed at 585 MDA 2022) has been resolved in a separate decision.

The Commonwealth also prosecuted multiple other individuals who pled guilty to their role in the drug distribution ring and testified against Appellant and Keogh after signing cooperation agreements.

- 2 -

On Saturday, January 6, 2018, at approximately 8:00 p.m., emergency personnel were summoned to an apartment in Greencastle Borough based on the report of an "unconscious toddler." Notes of Testimony (N.T.), 9/8/21, at 23. Higgins called 9-1-1 to report she had discovered three-year-old Child, lying in her bed, cold and stiff and with bruises on her face. *Id*. at 21.

When emergency medical technicians (EMTs) arrived at the home, they discovered Child lifeless, lying on her back on a bed in a bedroom near the kitchen. *Id*. at 34-35. EMT Richard Wertman indicated he did not believe the child had died recently as rigor mortis had already set in. *Id*. at 35-36.

When Corporal Ismail El-Guemra of the Pennsylvania State Police responded to the scene and was informed Child was deceased, he observed that Child had dark areas around her mouth and did not appear to have been cared for properly. *Id*. at 29. While speaking with Higgins and Appellant, Corporal El-Guemra noted that both adults appeared to be distressed, but noticed Appellant was in even more stress. *Id*. at 27.

The Forensics Services Unit of the State Police collected evidence and took photographs of the scene as well as Child's condition and the markings on her face. *Id*. at 41. Child was wearing a pink Hello Kitty shirt, was lying on a mattress without sheets, and her head was surrounded by stuffed animals. *Id*. at 47; N.T., 9/10/21, at 16-17. One of the investigators thought it was strange that Child was laying on a mattress without sheets and expressed concern that the bedroom could have been staged. *Id*. at 47.

Dr. Samuel Land conducted Child's autopsy and found no evidence of significant disease, infection, bacteria, virus, or organisms that could have been responsible for Child's death. *Id*. at 95-119. Dr. Land determined Child did not have any significant internal trauma or broken bones and asserted the bruises on Child's head were not the cause of her death. *Id*. at 100-103, 110-11.[3] Dr. Land noted that the dark coloration on Child's face was postmortem injury caused by "gastric contents," most likely vomit, that had splashed on her face and had been there for "some time." *Id*. at 107-109.

Dr. Land sent samples of Child's blood for toxicological testing, which revealed the presence of methamphetamine (18 nanograms/milliliter) and buprenorphine in her system (1.2 nanograms/milliliter). *Id*. at 67-68, 80, 95-97. Methamphetamine, a stimulant that is almost always used illegally, can elevate blood pressure and temperature, and can lead to seizures or misfiring of the heart. *Id*. at 96, 116. Buprenorphine is a semi-synthetic opioid used to treat opioid abuse and withdrawal symptoms. *Id*. at 96-97. Buprenorphine is sold as Suboxone or Subutex tablets that dissolve under the tongue; Suboxone contains naloxone whereas Subutex does not. *Id*. at 72, 99. Child's toxicology tests did not reveal the presence of naloxone. *Id*. at 95.[4]

---

[3] Dr. Land noted Child had a black eye as well as bruising to her left chin, which he opined was an unusual pattern of injury for a three-year-old. N.T., 9/8/21, at 111-113. Dr. Land also discovered a bruise on Child's face which he attributed to an open hand slap mark. *Id*.

[4] The prosecution presented testimony of forensic toxicologists that tested Child's blood samples. Dr. Robert Middleburg of NMS Labs testified that blood testing does not always detect the presence of naloxone as it might be in such a small quantity that it cannot be measured. N.T., 9/8/21, at 72-73.

Based on his professional training, education, and experience, Dr. Land concluded with a reasonable degree of medical certainty that Child's cause of death was mixed substance toxicity of methamphetamine and buprenorphine, neither of which was prescribed to Child. *Id*. at 114-117. Dr. Land indicated either drug could have been lethal to Child, but stated there was no way to differentiate which drug ultimately caused her death. *Id*. at 102.

When police initially interviewed Appellant and Higgins, Higgins told police that she was unsure of how Child had died as she was sick in bed all day with the flu on January 6, 2018, and she believed that Appellant was caring for Child. N.T., 9/9/22, at 21-22, 36.

However, when officers presented Higgins and Appellant with toxicology reports noting the presence of drugs in Child's system, Higgins and Appellant confessed that they were high on methamphetamine ("meth") the night of January 5, 2018 to the morning of January 6, 2018, the time period in which Child likely ingested the drugs. *Id*. at 30-33.

Higgins admitted to police that she and Appellant regularly used meth in the home they shared with her two children: L.H., her nine-year old son, and Child, her three-year old daughter. *Id*. at 30, 43-46. While Higgins had been prescribed Suboxone and Appellant was prescribed Subutex, the couple would share both of these drugs. *Id*. at 50-51, 112-13, 117, 129.

Higgins told police that she purchased meth on January 5, 2018 from Rodney (Allen) Mower, who delivered it to their residence at 5:00 p.m. *Id*. at 32-33, 47-48. Higgins conceded that she and Appellant bought meth to share

together on numerous occasions from Mower and other individuals. *Id*. at 47, 87-88. As Mower had just received a large amount of meth from his supplier, Mower cut the meth on their kitchen table to measure it out into individual packages. *Id*. at 69-76. When asked if the action in cutting the meth had left "teeny tiny particles … on [her] kitchen table at some point that Friday night," Higgins admitted it was possible. *Id*. at 76.

Higgins believed Child was in the living room behind a baby gate when Mower delivered the meth. *Id*. Once Higgins received the meth, she went into her bedroom to use the drugs and did not return that evening. *Id*. at 47-49. As Higgins was extremely dehydrated and malnourished from drug use, it would take her hours to find a vein to inject the meth. *Id*. at 47. When she finally injected herself, Higgins entered a trans-like state, and had sexual intercourse with Appellant. *Id*. at 56-57. After Higgins came down from her high, she crashed as she had gone days without sleep. *Id*. at 57.

Although Higgins woke around 9 or 10 a.m. the next morning to an alarm she had set to take care of the kids, Appellant turned off the alarm and told her he would take care of the children that day. *Id*. Appellant woke Higgins up several hours later around 6-7 p.m. and brought her food he had purchased from McDonald's. *Id*. at 54-59. When Higgins asked where the children were, Appellant indicated that Child appeared to be sleeping and L.H. was at his grandmother's house. *Id*.

Higgins went into Child's bedroom at 8 p.m to wake her up. *Id*. at 49. At that point, Higgins had not seen Child for more than 24 hours since she

injected the meth the previous evening and had not checked on her. *Id*. When Higgins discovered Child was cold, stiff, unresponsive, and with bruises on her body, she began to scream and asked Appellant, "[w]hat did you do?" *Id*. at 56, 61. Appellant responded with surprise, put his head in his hands, and claimed that he did not know what happened. *Id*. at 61. Thereafter, Higgins used her cell phone to call 9-1-1. *Id*. at 63.

Higgins noted that she found Child lying face up on the mattress without sheets but surrounded by stuffed animals. *Id*. at 54. Higgins did not notice any vomit near Child. *Id*. Higgins recalled that there was a sheet on Child's bed on the night of January 4, 2018 and asserted she always had sheets on Child's bed as the mattress was a plastic material. *Id*. at 54-55. Higgins claimed she did not put Child to bed on January 5, 2018. *Id*.

While Higgins denied cleaning up the bedroom after finding Child unresponsive, she admitted that she "probably" threw drugs away before first responders arrived. *Id*. at 55-56. Higgins did not suspect that L.S. died from ingesting drugs, but believed the marks on Child's face were bruises that had something to do with her death.

Higgins shared that she was careful to keep her meth and Suboxone in a small wooden jewelry box in her bedroom. *Id*. at 89-90. She found it helpful to store the drugs in her bedroom as she only typically used them there as it was so difficult for her to find a vein to do so. *Id*. at 68. She also kept her drugs concealed so Appellant would not use them. *Id*. at 91.

- 7 -

In comparison, Appellant would keep his drugs on his person so that he could use it when he wished and to keep it from Higgins. *Id*. at 90. Higgins indicated that Appellant would inject his drugs "wherever he needed to" and would use meth in multiple areas of the home, even in the kitchen or living room where the children were. *Id*. at 68.

Higgins felt Appellant was not careful with his drug use as he often left drugs in areas accessible to the children; Higgins addressed her concern with Appellant out of fear that her children would find the drugs. *Id*. at 92. On one of those occasions, Appellant left a needle full of drugs on the kitchen counter where Higgins' son found it and asked what it was. *Id*. at 92-93. Higgins realized Child could have easily found it as well. *Id*.

Higgins consented to a search of her cell phone. *Id*. at 65. At trial, the prosecution introduced text messages from Higgins to Appellant that were sent prior to Child's death. In one message, Higgins wrote, "[s]he always ends up with marks like that when we do [meth] and I space out. Are you sure you didn't get rough with her or something in the last few days[?]" *Id*. at 159. Appellant responded that he had no idea what happened to Child. *Id*.

In a text message one month before Child's death, Higgins wrote "you cannot ever leave shit out like this[,]" and sent Appellant a picture of his nightstand next to his bed, where he had left a spoon and Q-tips which were used to absorb drugs and presumably had drug residue on them. *Id*. at 160-61. Higgins then wrote "what if [Child] would have eaten it and overdosed before she woke me up this morning … you could have killed my child." *Id*. at

161-62. Higgins continued on, "[i]f you want to be her parent you've got to start thinking like a fucking parent." ***Id***. at 162.

Sergeant Aaron Martin testified that officers conducted a second search of Appellant and Higgins' apartment after receiving Child's toxicology reports and recovered both drugs and paraphernalia. ***Id***. at 229*.* Specifically, police discovered a white powdery substance on the night table, in a syringe, and on the floor next to Appellant's side of the bed. ***Id***. at 232-34. Officers also found packaging for buprenorphine and naloxone tablets, as well as Q-tips, syringes, glassine baggies, foil wrappers used for smoking, and smoking devices made of glass and metal. ***Id***. at 234-239.

Trooper Lindsay Trace, the lead investigator, testified as to his role in conducting interviews with Appellant after Child's death and the electronic evidence obtained from Appellant's cell phone. N.T., 9/10/21, at 7-8. Trooper Trace indicated that Appellant eventually confessed to using meth the night of January 5, 2018 and early morning of January 6, 2018. In addition, Trooper Trace recalled that Appellant shared that he put the children to bed on the night of January 5th because Higgins was sick in her room.

Trooper Trace testified that investigators recovered deleted videos from Appellant's phone taken the morning of January 6, 2018. ***Id***. at 105. The first video, taken at 10:18 a.m. shows Appellant standing over Child as she lay in bed. N.T., 9/13/21, at 5. The second video, taken at 11:18 a.m., scanned Child's body and showed her wearing a red shirt, which was different than the Hello Kitty shirt Child was wearing when she was found by first responders.

*Id*. at 5-6, 11-12; N.T., 9/8/21, at 47. In addition, in the video, there were no stuffed animals on Child's bed, but first responders found numerous stuffed animals on her bed when they found Child deceased. N.T., 9/8/21, at 12-13. Trooper Trace testified that Child's room looked different in the video than when he had arrived at the scene. *Id*. at 15.

Trooper Trace obtained Appellant's internet search records for the morning of January 6, 2018, which showed two searches on how to shock the heart back into rhythm, three searches for toddler not breathing, limp body, and eight searches for toddler CPR. *Id*. at 39. There were no searches for child ingestion of Subutex, Suboxone, or buprenorphine. *Id*.

Dr. Kathryn Crowell, a pediatrician at Penn State Hershey Children's Hospital, testified as an expert in child abuse and neglect. When viewing photographs of Child's bruises on her body, Dr. Crowell believed such injuries were caused by "blunt force trauma" and repetitive abuse, opining that someone struck Child with more force than should have been used with "general caretaking and day-to-day activities." N.T., 9/9/21, 14, 19-20.

The prosecution presented testimony of Brittany Baker, an acquaintance of Appellant and Higgins who sold them meth and also abused controlled substances. Baker indicated that on January 6, 2018, the day Child was discovered deceased, she met with Appellant on two separate occasions to sell him meth, once at approximately 10 a.m. and again in the evening. *Id*. at 180-83. When Baker asked where Higgins was, Appellant told her that Higgins and the kids were sick and sleeping. *Id*. at 182.

Appellant testified in his own defense at trial. He characterized himself as a "functioning drug addict" that was able to hold employment. N.T., 9/15/21, at 59-60. He recalled that on the evening of January 5, 2018, Mower delivered meth to the apartment Appellant shared with Higgins and her children. *Id*. at 61-62. Appellant described the meth as the size of a baseball and the largest amount of meth he had ever seen. *Id*. Appellant agreed Mower weighed and divided the meth on the couple's kitchen table. *Id*. at 63-64.

Appellant admitted that he and Higgins started to inject the meth after Mower left, but Higgins went into her bedroom to do so. *Id*. at 65-66. Appellant believed the children were behind a baby gate in the living room when the meth was delivered and claimed he put them to bed around 11 p.m. *Id*. Appellant alleged for the first time at trial that Higgins went into Child's bedroom thirty minutes after he had put her to bed. *Id*. at 68. Appellant did not sleep at all the evening, but stayed awake having sexual intercourse with Higgins until 5 or 6 a.m. *Id*. at 71.

When Appellant checked on Child at approximately 10 a.m., he found her unresponsive, cold, and blue. *Id*. at 72-73. He attempted to slap her to "see what's going on" and believed she might have been deceased. *Id*. Appellant claimed that he tried to give Child CPR and did not realize Child had ingested drugs. *Id*. at 74-77. Appellant testified that there was no vomit on Child and denied changing her clothes. *Id*. When asked if Higgins had changed Child's clothes, he responded, "it would have had to have been." *Id*.

Appellant asserted that he took videos of Child in her bed accidentally and subsequently deleted it, not because he wanted to obstruct the investigation, but simply because he did not realize what the video was. *Id*. at 79-80. After finding Child unresponsive, Appellant admitted that he did not call an ambulance, but instead went to purchase more meth. *Id*. at 82-83.

Appellant claimed that he did not know Child had ingested drugs, but learned she died from drug toxicity when one of the troopers told him. *Id*. at 76-77. Appellant admitted to his drug use at the home he shared with the children, but claimed he and Higgins had "separate stashes" of drugs and denied ever leaving drugs or drug paraphernalia unattended. *Id*. at 95. When asked if he was responsible for Child's death, he responded that "I used meth, absolutely. It was in her system absolutely but did we both have separate stashes, did I leave with some left on the table by me, no." *Id*. at 85.

At the conclusion of the trial, the jury acquitted Appellant of third-degree murder, but convicted him on the remaining charges. On November 10, 2021, trial court sentenced Appellant to the following terms of imprisonment: 60-120 months for involuntary manslaughter, two terms of 36-72 months for endangering the welfare of a child, 30-60 months for unlawful delivery, 18-36 months for criminal use of a communication facility, and 6-12 months for possession of drug paraphernalia. As all these sentences ran consecutively (with the exception of the paraphernalia charge), Appellant received an aggregate sentence of 180-360 months' (15-30 years') imprisonment.

On November 22, 2021, Appellant filed timely post-sentence motions,[5] which the trial court denied on March 22, 2022. On April 18, 2022, Appellant filed timely notices of appeal and subsequently complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal (stated verbatim):

1. Whether the evidence presented at trial was legally insufficient to establish that [Appellant's] actions/inaction was a direct cause of death where the Commonwealth's expert opined that the cause of death was mixed drug toxicity?

2. Whether [Appellant's] conviction for Involuntary Manslaughter was against the weight of the evidence where the Commonwealth's theory at trial was the deceased child accidentally ingested two separate narcotics? In the alternative, Bennett's failure to render aid (which is belied by the record) was not a direct cause of the child's death from multiple drug toxicity and the verdict shocks one's sense of justice?

3. Whether the trial court erred in sentencing outside the aggravated range was manifestly and unduly harsh as the sentencing scheme employed by the Court on all convictions was tantamount to a sentence for third-degree murder – a charge Appellant was acquitted of by the jury. Especially in light of the fact that the for-profit narcotics dealer ([Appellant's] co-defendant at trial) was given substantially less time for a more serious conviction)?

Appellant's Brief, at 8 (renumbered for ease of review).

_____

[5] Appellant's post-sentence motions were timely filed on Monday, November 22, 2021. **See** 1 Pa.C.S.A. § 1908 (whenever the last day of any … period shall fall on a Saturday or Sunday, or on any day made a legal holiday…, such day shall be omitted from the computation).

In the first two issues, Appellant challenges the sufficiency and weight of the evidence supporting his conviction for involuntary manslaughter. We begin by noting the difference between sufficiency and weight claims:

> The distinction between a claim challenging the sufficiency of evidence and a claim challenging the weight of evidence is critical. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but claims that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." A claim challenging the sufficiency of the evidence, however, asserts that there is insufficient evidence to support at least one material element of the crime for which Appellant has been convicted.

*Commonwealth v. Arias*, ___A.3d ___, 2022 PA Super 202 (Pa.Super. 2022) (quoting *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa.Super. 2003) (citation omitted)).

When reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d 133 (Pa.Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. *Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. *Moreno*, *supra* at 136.

*Commonwealth v. Juray*, 275 A.3d 1037, 1042 (Pa.Super. 2022) (citations omitted).

The Crimes Code provides that an individual "is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a). In other words, "involuntary manslaughter requires 1) a mental state of either recklessness or gross negligence[,] and 2) a causal nexus between the conduct of the accused and the death of the victim." *Commonwealth v. Fabian*, 60 A.3d 146, 151 (Pa.Super. 2013) (quoting *Commonwealth v. McCloskey*, 835 A.2d 801, 806 (Pa.Super. 2003)).

Specifically, Appellant limits his sufficiency challenge to argue that there was insufficient evidence that his conduct was a legal cause of Child's death. As the autopsy revealed that Child's cause of death was mixed substance toxicity, Appellant claims the prosecution failed to show how Child simultaneously ingested both meth and buprenorphine and could not prove which drug ultimately was the cause of Child's death.

As to the meth, Appellant denies that Child accessed his stash of meth as he testified that he did not leave his meth unattended. With respect to the buprenorphine, Appellant also contends that the prosecution failed to present any evidence as to how Child accessed this drug. Further, Appellant argues that Child could not have ingested Subutex, the brand of buprenorphine Appellant was prescribed as Child did not have naloxone in her system.

In addition, while Appellant admits that he failed to seek emergency assistance for Child when he found her lifeless on the morning of January 6,

2018, he asserts there is no evidence that the delay in contacting medical personnel resulted in Child's death.

In reviewing similar claims, this Court has held that:

"It is undisputed that the Commonwealth must prove a *direct* causal relationship between the acts of a defendant and the victim's death." ***Commonwealth v. Long****,* 425 Pa.Super. 170, 624 A.2d 200, 203 (1993). "Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor producing the death." ***Commonwealth v. McCloskey****,* 835 A.2d 801, 807 (Pa.Super. 2003) (citing ***Commonwealth v. Nicotra****,* 425 Pa.Super. 600, 625 A.2d 1259, 1260 (1993)). "This is true even though 'other factors combined with that conduct to achieve the result.'" ***Id****.* Additionally:

> In order to impose criminal liability, causation must be direct and substantial. Defendants should not be exposed to a loss of liberty based on the tort standard which only provides that the event giving rise to the injury is a substantial factor. Although typically the tort concept refers to only substantial and not to direct and substantial as in the criminal context, the additional language in the criminal law does not provide much guidance. Therefore, criminal causation has come to involve a case-by-case social determination; i.e., is it just or fair under the facts of the case to expose the defendant to criminal sanctions. In other words, was the defendant's conduct so directly and substantially linked to the actual result as to give rise to imposition of criminal liability or was the actual result so remote and attenuated that it would be unfair to hold the defendant responsible for it?

***Commonwealth v. Rementer****,* 410 Pa.Super. 9, 598 A.2d 1300, 1304–05 (1991). "In seeking to define the requirement that a criminal defendant's conduct be a direct factor in the death of another, the courts of this Commonwealth have held that 'so long as the defendant's conducted started the chain of causation which led to the victim's death, criminal responsibility for the crime of homicide may properly be found.'" ***McCloskey****,* 835 A.2d at 808 (citing ***Nicotra****, supra*).

***

- 16 -

> "[*I*]*t has never been the law of this Commonwealth that criminal responsibility must be confined to a sole or immediate cause of death*." *Commonwealth v. Skufca*, 457 Pa. 124, 321 A.2d 889, 894 (1974) (citation omitted). "*Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result*." *Id.*

*Fabian*, 60 A.3d at 152 (emphasis added).

Our review of the record in this case shows the Commonwealth met its burden of proving beyond a reasonable doubt that Appellant's conduct was a direct and substantial factor in causing Child's death. While Child's autopsy results revealed Child's cause of death was mixed substance toxicity of meth and buprenorphine, Appellant and Higgins admitted they regularly possessed and used both of these substances in the home they shared with Child.

More specifically, Appellant and Higgins admitted that they purchased and used meth on the evening of January 5, 2018, just hours before Child was found lifeless in her bed. Appellant and Higgins conceded that their seller, Mower, cut a large amount of meth on their kitchen table, an area accessible to Child. Although Appellant and Higgins asserted that Child was behind a baby gate when the meth was delivered, they admitted that after Child was placed in her bedroom that night to go to sleep, Child could leave her bedroom and was not restricted from entering the kitchen.

With respect to Child's ingestion of buprenorphine, Appellant asserts that Child must have accessed Higgins's Suboxone tablets (and not Appellant's Subutex tablets) as toxicology reports showed that Child did not have

naloxone in her system. However, this argument is based on Appellant's faulty premise that Subutex contains naloxone and Suboxone does not. In reality, as suggested by its name, Suboxone contains naloxone and buprenorphine, whereas Subutex is merely buprenorphine. As such, this contention actually works against the defense as the absence of naloxone in the toxicology reports would suggest that Child ingested Subutex, the brand of buprenorphine prescribed to Appellant.[6]

Despite the fact that no individual witnessed Child ingesting meth or buprenorphine before her death, the jury was free to consider the circumstantial evidence to conclude that Child accessed these substances that were in Appellant's possession and control. Appellant admitted that there were no other sources of meth other than the amount he and Higgins purchased from Mower that evening.

Appellant's claim that Child could not have accessed the drugs in his "stash" is belied by the record. In addition to the fact that Appellant and Higgins may have left drug residue on the kitchen table the night before Child ingested meth, Higgins had confronted Appellant on multiple prior occasions when he recklessly left drugs and paraphernalia in areas accessible to her children and Higgins had expressed concern for their safety. Appellant

---

[6] Nevertheless, the absence of naloxone in Child's blood is not dispositive as forensic toxicologists testified that naloxone is often not measured in testing as it may be present in amounts too small to detect. Moreover, Appellant and Higgins shared their buprenorphine prescriptions with each other.

admitted that he used his drugs in multiple areas of the house whereas Higgins claimed she confined her drug use to her bedroom.

Moreover, other circumstantial evidence points to Appellant's culpability including the fact that he was the individual who put the children to bed on January 5, 2018. Appellant wanted the children to go to bed so that he and Higgins could do meth and have sexual intercourse. While Appellant told police that Higgins remained in her bedroom from the night of January 5th and the majority of the day on January 6th, Appellant conceded that he did not sleep the entire night, turned off Higgins's alarm in the morning, and told her he would take care of the children.

Appellant's phone contained videos that showed he found Child unresponsive in the morning of January 6th. While his internet search history revealed inquiries about child CPR, Appellant did not seek emergency care to help Child. Instead, after finding Child in this state, Appellant left the home on two occasions to purchase more meth and fast food. Appellant admitted he did not tell Higgins about Child's condition, which Higgins did not discover until the evening of January 6th, after which she called 9-1-1.

Further, first responders discovered Child in a scene that had been manipulated since the recording of the videos on Appellant's phone that morning. Child's clothes had been changed and stuffed animals had been staged on her bed, which did not have any sheets.

Reviewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient

evidence to allow the jury to infer that Appellant's reckless conduct caused Child's death. Therefore, there is no merit to his sufficiency challenge.

Appellant also claims his involuntary manslaughter conviction is not supported by the weight of the evidence. Our standard of review for challenges to the weight of the evidence is well-established:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

***Commonwealth v. Windslowe***, 158 A.3d 698, 712 (Pa.Super. 2017) (citations omitted).

In raising this claim on appeal, Appellant simply asks this Court to find the jury's verdict was against the weight of the evidence. Appellant does not cite to this Court's standard of review in evaluating whether the trial court abused its discretion in denying his challenge to the weight of the evidence.

In a recent decision, a panel of his Court in ***Commonwealth v. Rogers***, 259 A.3d 539, 541 (Pa.Super. 2021), *appeal denied*, 280 A.3d 866 (Pa. 2022),

found that the appellant did not properly mount an abuse-of-discretion attack against the trial court's decision to deny his challenge to the weight of the evidence, when the appellant failed to cite the correct standard review and "demonstrate how the trial court's ruling overrode the law, was manifestly unreasonable, or the product of bias, prejudice, ill-will or partiality." **Id**. at 542. As such, this Court was dismissed the weight claim as the appellant did not show that an abuse of discretion had occurred.

Similarly, in this case, Appellant does not acknowledge the distinction between the standards of review applied by trial courts and appellate courts to claims challenging the weight of the evidence. Appellant simply asks this Court to set aside the jury's verdict, which he characterizes as "so contrary to the evidence as to shock one's sense of justice." Appellant's Brief, at 32.

However, we may not conduct a *de novo* review of whether the jury's verdict shocked the trial court's conscience, but must defer to the trial court's discretion. As Appellant has made no attempt to assess whether the trial court abused its discretion, we must dismiss his challenge to the weight of the evidence as meritless.

Lastly, Appellant claims that the trial court's sentencing scheme, which included multiple consecutive sentences in the aggravated range of the guidelines, was manifestly and unduly harsh. In reviewing challenges to the trial court's sentencing discretion, we are mindful that:

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-

part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Manivannan**, 186 A.3d 472, 489 (Pa.Super. 2018) (quotation marks, some citations, and emphasis omitted).

Appellant filed a timely notice of appeal and preserved numerous sentencing claims in a timely post-sentence motion. Appellant's brief contains a statement pursuant to Pa.R.A.P. 2119(f) in which he asserts that the trial court (1) imposed aggravated range sentences without considering mitigating factors and Appellant's rehabilitative needs, and (2) ran multiple sentences at the top of the guideline ranges consecutively. Appellant's Brief, at 16-17.

In addition, to obtain review of a challenge to the discretionary aspects of a sentence, the appellant must raise also raise a substantial question that the sentence violates either the Sentencing Code or any fundamental sentencing norm. **Commonwealth v. Banks**, 198 A.3d 391, 401 (Pa.Super. 2018). We make the substantial-question determination based on the contents of the Rule 2119(f) statement. **Commonwealth v. Mouzon**, 812 A.2d 617, 621-22 n. 14 (Pa. 2002) (noting that an "appellate court decides whether to review the discretionary portions of a sentence by reviewing the Rule 2119(f) statement") (emphasis and citation omitted).

This Court has held that a claim that the trial court imposed an aggravated range sentence without consideration of mitigating circumstances raises a substantial question for our review. ***Commonwealth v. Felmlee***, 828 A.2d 1105, 1107 (Pa.Super. 2003) (*en banc*). In addition, this Court has found that "a substantial question exists when the issue is whether the decision to sentence consecutively raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct[.]" ***Commonwealth v. Bankes***, ___A.3d___, 2022 PA Super 212 (Pa.Super. 2022) (quoting ***Commonwealth v. Gonzalez-DeJusus***, 994 A.2d 595, 598-99 (Pa.Super. 2010)).

In light of the foregoing, we conclude that Appellant's claim that the trial court failed to consider his rehabilitative needs and mitigating factors upon fashioning its aggravated range sentences along with his challenge to the imposition of his consecutive sentences as unduly excessive, each raises a substantial question. Thus, we proceed to address the merits of his sentencing claims.[7] ***Commonwealth v. Swope***, 123 A.3d 333, 340 (Pa.Super. 2015).

Our standard of review of a sentencing claim is as follows:

---

[7] Appellant also baldly claims that the trial court's sentence is excessive when compared to (1) the sentence given to his co-defendant, Keogh and (2) the penalty for a third-degree murder conviction for which Appellant was acquitted. Appellant did not raise these claims in his Rule 2119(f) statement or develop analysis to support his arguments on appeal. We find these claims waived for lack of development. ***Commonwealth v. Antidormi***, 84 A.3d 736 (Pa.Super. 2014) ("[a]s Appellant has cited no legal authorities nor developed any meaningful analysis, we find this issue waived for lack of development").

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa.Super. 2006).

Pursuant to Section 9721(b) of the Sentencing Code, courts "shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). "[T]he court shall make as part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed." *Id*. Nevertheless, "[a] sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa.Super. 2010).

Rather, the record as a whole must reflect the sentencing court's consideration of the facts of the case and the defendant's character. *Id*. "In particular, the court should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation." *Commonwealth v. Griffin,* 804 A.2d 1, 10 (Pa.Super. 2002).

Appellant's claim that the trial court failed to consider mitigating factors and his need for rehabilitation is belied by the record. Notably, the trial court had the benefit of a pre-sentence investigation (PSI) report prior to sentencing. "[W]here the trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Ventura*, 975 A.2d 1128, 1135 (Pa.Super. 2009) (citation omitted). In addition, we can assume the court was aware of the relevant information regarding Appellant's character and weighed those considerations along with mitigating statutory factors. *Commonwealth v. Hill*, 210 A.3d 1104, 1117 (Pa.Super. 2019) (internal quotation marks and citation omitted).

The sentencing transcript also shows that the trial court noted on the record that it had considered multiple mitigating factors such as Appellant's "substance use history, criminal history, employment history, his version of events, and the many letters of support that were provided." N.T. Sentencing, 11/10/21, at 50. The trial court specifically noted the following:

> [Appellant], I do think that the fact you have so many individuals who have taken the time to write me very thoughtful[,] caring letters, leads me to believe when this is all over you have a loving, supportive family and community to return to, and that I urge you to rely on the strength of these individuals as you continue to deal with the consequences of your behavior.

*Id*. at 59-60.

The trial court also recognized Appellant's need for rehabilitation as it noted Appellant was "in the throes of his addiction" when he arranged two drug transactions after finding Child was unresponsive instead of contacting emergency personnel. *Id*. In imposing the sentence, the trial court directed that Appellant submit to a drug and alcohol assessment and undergo treatment and periodic testing as a condition of the sentence.

In its decision denying Appellant's post-sentence motion, the trial court recognized Appellant had admitted to participating in two drug transactions after Child's death and expressed remorse. However, the trial court noted that Appellant in his trial testimony had attempted to minimize his role in Child's death and had not been fully truthful even when presented with the prosecution's evidence.

We also reject Appellant's claim that the trial court's sentencing scheme was "manifestly and unduly harsh" in that it chose to impose multiple aggravated range sentences and run them consecutively. It is well established that the trial court has discretion to impose its sentences consecutively or concurrently to other sentences being imposed at the same time or to sentences already imposed. **See** 42 Pa.C.S.A. § 9721(a); **Commonwealth v. Wright**, 832 A.2d 1104, 1107 (Pa.Super. 2003) (recognizing that "the trial [court] may determine whether, given the facts of a particular case, a sentence should run consecutive to or concurrent with another sentence being imposed").

This Court has declined to disturb a consecutive sentencing scheme unless the aggregate sentence is "grossly disparate" to the defendant's conduct, or "viscerally appear[s] as patently unreasonable." ***Gonzalez-Dejusus***, 994 A.2d at 599.

Our review of the record leads us to conclude that it was reasonable for the trial court to run Appellant's individual aggravated range sentences consecutively to impose an aggregate term of 15-30 years' imprisonment. The trial court considered the gravity of Appellant's offenses and their impact on the victim and the community. The untimely death of three-year old Child "turned her family's lives upside down" in the "most horrific set of circumstances anyone could ever envision having to live through." N.T. 11/10/21, at 45; Trial Court Opinion (T.C.O.), 3/21/22, at 44-45.

The trial court explained its rationale for imposing aggravated range sentences:

> [Appellant,] I have sentenced you in this way. Some of these sentences are at the top of the standard range – top of the aggravated range. I need for you to understand that I made this determination based on the evidence I heard. A little girl died on your watch.
>
> The single most damning and disturbing piece of evidence that I saw, and I would suggest, perhaps, the jury say, was the video that you likely were not aware you took or probably would have tried to get rid of it, of you entering [Child's] bedroom, trying to wake her by slapping her, and then leaving.
>
> A period of time elapsed, 12 hours, during which that little girl laid on her bed. I don't know if she was already dead when you tried to slap her or if she was in a severely compromised state, but what I do know is that for that period of time between you

entering her bedroom and finding her in that state and her mother eventually calling 911, you did nothing.

You may have performed searches, and there was evidence to suggest you performed searches on the internet to figure out how to resuscitate her, but you never called people who could have helped.

Instead, in the throes of your addiction, you arranged two separate drug deliveries. I find that to be cold, callous, hard-hearted, and the kind of behavior of someone who is completely devoid of any ability to provide care of a child.

These are the circumstances. I also saw evidence of a series of bruises, text messages from [Child's] mother to you, that lead me to believe that [Child] was subjected to abusive behavior over a course of conduct.

So these are the reasons I'm imposing the sentence that I have imposed.

N.T., 11/10/21, at 58-60.

We conclude that Appellant's aggregate sentence of 15 to 30 years' imprisonment is not patently unreasonable or grossly disparate to the criminal conduct proven in this case. We also decline to find that the trial court was required to give Appellant a volume discount for the numerous crimes for which he was convicted. *See Commonwealth v. Clary*, 226 A.3d 571, 581 (Pa.Super. 2020) (emphasizing that "defendants convicted of multiple offenses are not entitled to a 'volume discount' on their aggregate sentence").

Accordingly, our review of the record, party briefs, trial court opinion, and relevant authority uncovers no reason to disturb the trial court's discretion in imposing its sentence. *See Shugars*, *supra* ("[s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion").

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2023